(November 24, 1905.)

## STATE v. WETTER.

### [83 Pac. 341.]

INFORMATION CHARGING MURDER—APPLICATION FOR CONTINUANCE—APPLICATION TO TAKE DEPOSITIONS—ADMISSIBILITY OF EVIDENCE—INSANITY—INSTRUCTIONS.

1. Where an information charges murder and a demurrer is filed which is overruled by the court, and no error is predicated on such ruling in this court, it will be treated as waived.

2. Where an application for a continuance is filed and overruled by the court, it will only be reversed in this court where it is shown that there was an abuse of discretion in the court below.

3. Where there is an application to take depositions outside of this state, and such application is denied by the lower court, and it further appears that the evidence sought to be procured would not change the result of the trial, the action of the lower court will not be disturbed. The granting or refusal of such application being within the discretion of the trial court, it will only be disturbed where it is shown that there has been an abuse of such discretion.

4. Where a witness is asked a question that in itself is immaterial and no foundation is laid by which it may become material, a ruling sustaining the objection will be sustained.

5. Where the defense is insanity, it is always brought into the case by the defendant, and until he furnishes such evidence of insanity—at least sufficient to raise a question of doubt in the minds of the jurors—the prosecution may rest upon the legal proposition that all men are supposed to be sane and legally responsible for their acts.

6. Where it is shown that the instructions taken as a whole correctly state the law and are uniformly fair to the defendant, and that from the entire record no possible benefit could flow to the defendant from granting a new trial, the judgment will be sustained.
(Syllabus by the court.)

APPEAL from the District Court of Idaho County. Honorable Edgar C. Steele, Judge. Judgment affirmed.

W. N. Scales, for Appellant.

An erroneous instruction containing a plain statement of an incorrect principle of law is not cured by other instructions. (*People v. Westlake,* 124 Cal. 452, 57 Pac. 467; *People v. Higgins* (Cal.), 12 Pac. 301; *State v. Webb,* 6 Idaho, 428, 55 Pac. 892.)

J. J. Guheen, Attorney General, Edwin Snow and F. S. Wettach, for Respondent.

In asking for a continuance on the ground of absence of a material witness, it is not sufficient that the affidavit should state that the attendance of such witness can be procured at the next term. It must state the ground of such opinion of the affiant as to such attendance, so that the court may form its own conclusion on the subject. (*Dacey v. People,* 116 Ill. 566, 6 N. E. 155; *State v. O'Neill,* 13 Or. 183, 9 Pac. 284.) In *State v. Turlington,* 102 Mo. 643, 15 S. W. 141, it is said: "Where it appears that the testimony of absent witnesses, as set out in an application for a continuance, would not make out such a defense of insanity as required by law, if the witnesses were present, the application is rightly overruled."

(*Faulkner v. Territory,* 6 N. Mex. 464, 30 Pac. 905; *Fisher v. State,* 30 Tex. App. 503, 18 S. W. 90.) Where a prisoner relies upon a plea of insanity, but there is no evidence whatever that he had exhibited any sign of insanity, evidence tending to show that some of his uncles and aunts were insane is inadmissible. (*Green v. State,* 64 Ark. 523, 43 S. W. 973; *People v. Smith,* 31 Cal. 466; *Bradley v. State,* 31 Ind. 492; *Sawyer v. State,* 35 Ind. 80; *State v. Van Tassel,* 103 Iowa, 11, 72 N. W. 497; *Laros v. Commonwealth,* 84 Pa. St. 201; *State v. Cunningham,* 72 N. C. 469.)

STOCKSLAGER, C. J.—The prosecuting officer of Idaho county filed an information in that county charging the defendant with the crime of murder. The charging part of the information follows: "That the said Rudolph Wetter, on or about the nineteenth day of July, 1904, at the county of Idaho, state of Idaho, then and there being, did then and there willfully, deliberately, 'premeditatedly,' unlawfully, feloniously and with malice aforethought kill and murder one Christ Long, a human being, by then and there willfully, deliberately, 'premeditatedly,' unlawfully, feloniously, and with malice aforethought, shooting at, in and upon the body and person of the said Christ Long, with a certain gun, to wit, a rifle, the same then and there being a deadly weapon, and then and there loaded with powder and leaden ball, and then and there held in the hands of the said Rudolph Wetter, and the said Rudolph Wetter did then and there willfully, deliberately, premeditatedly, unlawfully, feloniously and with malice aforethought, wound, kill and murder him, the said Christ Long."

Counsel for appellant demurred to the information, first, "that said information does not state facts sufficient to constitute a public offense; second, that said information does not substantially comply with the requirements of sections 7677, 7678, 7679 of the Revised Statutes of Idaho." This demurrer was overruled, and an exception saved, but counsel for appellant does not urge the ruling of the court as error, hence we infer, after more mature deliberation, he abandoned it; at

least we will treat it as waived. It is also shown that at the time fixed for defendant to plead, his counsel filed a motion to·set aside the information. This motion was overruled, to which ruling an exception was saved.

Counsel for appellant does not urge this ruling as error, hence it will be treated waived also. On the ninth day of September, W. N. Scales, counsel for appellant, filed a motion supported by his affidavit for a continuance of the case until a future term of the court. In this affidavit it is shown that the preliminary examination was had on the first and second days of August, 1904, and the defendant held to answer; that on the fifth day of September thereafter, the county attorney filed an information charging defendant with murder in the first degree, and on the same day filed a second information charging the defendant with a like offense. The affidavit then states that one of the defenses to be interposed, and which will be a substantial and material part of the defense, will be that at the time of the alleged offense defendant was insane and not responsible for any act committed at that time. That affiant has been informed that some of the near relations of the defendant· have been or are insane; that affiant has been informed that a brother of defendant is insane and was confined in the insane asylum in California. Then the affidavit states that affiant had addressed a letter to the "Superintendent Insane Asylum, Asylum Station, California," in which affiant had requested said superintendent to inform him whether said brother of defendant was confined in said asylum, the cause of such insanity, how long he had been there, what form it assumed, whether he was cured, and where he now was; that affiant informed said superintendent of the great importance of the information sought and the necessity for a prompt response. That said letter was duly mailed; that afterward it was returned with the San Francisco and another postmark, for better direction. That affiant has been informed that said address was correct. Affiant was also informed that said brother was admitted to the insane asylum under the name of Jos (or Thomas) C. Brainbridge. That thereafter defendant received a letter addressed on the inside

"Dear Brother" and signed "Your sister, Amelia," therein giving her address as New Hope, Pennsylvania. Said letter bore the postmark, "Grangeville, Idaho, Sept. 1st, 1904," and "New Hope, Pennsylvania, Aug. 22, 1904," and was handed thereafter to affiant, in which appears this: "I had hoped Charlie was the only one of the family who would show any signs of insanity." Affiant has never had any communication with any member of the family, did not know their address, and the last-mentioned letter seems from its reading to have been written on account of information received from one Mrs. Campbell, postoffice, Resort, that the defendant was in trouble. From what affiant has heard and from said letter he is thoroughly convinced that the defendant has near relatives, or a near relative, insane, or who has been insane. Then it is stated that affiant will be unable to ascertain the facts in regard to the insanity of the near relatives of defendant in time for trial at the present term of court; that defendant has no relatives in Idaho, as far as affiant knows or believes; that there is no witness or person in this state that this affiant knows or has known of by which he can prove anything about the insanity of the relatives of defendant. That such testimony will be absolutely necessary and material in the defense of the defendant; that affiant is convinced that if this action is postponed until the next regular term of this court, he can either have a personal attendance of some person who will testify in regard to the insanity of the near relatives of the defendant; otherwise he can obtain a deposition of such person or persons; and a deposition of the superintendent of the insane asylum in which said brother was detained. That affiant cannot obtain at the present term of court the facts necessary to make a fair and just defense of the defendant, and without the evidence indicated herein the defendant cannot safely go to trial. That affiant cannot state the exact facts which he will be able to prove in regard to the insanity of the near relatives of the defendant, nor can he ascertain them from the defendant, who has been, as affiant is informed, long absent from his home, and knows nothing of his own

knowledge about the same; nor can affiant give the names of the witnesses by whom he can prove the same, but affiant is certain that if this cause be postponed, he can prove that the brother of the defendant is or has been insane, and possibly other near relatives of defendant; can show the form such insanity assumed, and all necessary facts in connection therewith. That affiant is informed that the home of defendant was in the state of Pennsylvania; that his relatives live there and much of the evidence which he expects to procure in regard to such insanity must come from said state.

This motion was overruled on the ninth day of September, 1904, and at that time the court fixed the time for trial for September 19, 1904. On the tenth day of September another motion was filed, which counsel for appellant terms a renewal of his motion of the 9th, and supports it by his own affidavit and that of appellants. The affidavit of Mr. Scales contains no new matter as to the alleged insanity of defendant. It sets out that he has not sufficient time to prepare for the defense of defendant; that the place of the alleged offense is about seventy miles from Grangeville, his residence, and the county seat—in the mountains. "That it will be necessary to take depositions of witnesses out of the state of Idaho in regard to the insanity of the near relatives of defendant or to have their personal attendance, neither of which can be done in time to try the above-entitled cause at this term of the above-entitled court."

The affidavit of defendant shows that he has a brother, Charles A. Wetter, who is insane, the nature and form of which insanity he does not know. That he has a father, mother and sister, living in Pennsylvania, postoffice, Furlong. That he has no relatives in the state of Idaho; that there is no person in the state of Idaho by whom he can prove anything about the insanity of his said brother. That said brother was confined in the insane asylum in the state of California; that the "Charlie" referred to in the letter of his sister mentioned in the affidavit of W. N. Scales is that brother.

That if this action is postponed for the term, he can and will have the depositions or personal attendance of his father,

mother or sister, giving the facts and circumstances of the insanity of said brother, and possibly other members of the family.    That he can and will have, at the next term, the deposition of the superintendent of the insane asylum in California, in which his brother was confined.    That since the alleged offense affiant has been deprived of his liberty, and has had no opportunity to prepare his defense, and is not prepared at this time to go to trial; that affiant has no money, but in a letter of his said sister referred to she in substance offers to aid affiant in any way she can, but affiant did not receive said letter until during the present month.''    This motion was overruled.    The next step shown by the record was an ''Application for Examination of Witnesses.''    It was for an order of the court that a commission be issued to take the testimony of Rebecca Wetter, Ramsey C. Wetter and Amelia Magill, all of Furlong, state of Pennsylvania, to be used on behalf of defendant at his trial.    This application is supported by the affidavit of defendant and W. N. Scales, his counsel, in support of the two applications for continuance.    In his affidavit defendant recites the facts of the filing of the information on September 5, 1904, and the plea of not guilty September 8th; then recites that he desires the testimony of his father, mother and sister, and reiterates that they reside at Furlong, Pennsylvania, and will testify as to the fact of the insanity of the brother of defendant, the form of such insanity, and all facts and circumstances in connection therewith; that such testimony is necessary and material in behalf of defendant in the trial of his case.    On the fourteenth day of September this application was heard by the court, and the following order made: ''The above-entitled matter coming on to be heard on the fourteenth day of September, 1904, at the hour of 9 o'clock, A. M., on the motion and application of the defendant for the court to grant a commission for the taking of depositions of witnesses alleged to be residing outside of the state, it appearing to the court that the defendant in his showing, in support of his motion and application, has failed to make said showing until said cause was set for trial, and that the time is too short to

procure any of said depositions, and witnesses have been subpoenaed on behalf of the state, and a great many of whom reside a long distance from here, and already a big expense in securing them has been incurred, and that the granting of said commission would be useless for above reasons, and the showing is too indefinite and uncertain as to what the defendant expects to prove by said witness; it is therefore ordered that said motion and application to take depositions is hereby denied.

"EDGAR C. STEELE,
"Dist. Judge."

It is next shown that on the tenth day of September, 1904, defendant caused to be issued a subpoena for William De Moss and others, and that said subpoena was placed in the hands of the sheriff of Idaho county on the same day for service, and was returned on the sixteenth day of September, 1904, with witness De Moss not served.

Defendant files a motion for continuance based on the affidavit of W. N. Scales, his counsel, and the affidavits of Mr. Scales and defendant in support of other motions for continuance heretofore referred to. After stating all the facts relative to the action of the court in denying his former motions for continuance, Mr. Scales testifies that on the tenth day of September, 1904, he telegraphed to the sister of defendant at Furlong, Pennsylvania, asking her to come to Grangeville, Idaho, where this trial is to be held, and on September 16, 1904, received a letter from said sister, Mrs. Amelia Magill, in which she stated: "It is impossible for any of the family to come out, owing to lack of money." Also this: "Personally, we have no doubt as to Rudolph's [meaning the defendant] insanity." Affiant says that inclosed in said letter was a letter to Mr. Wetter from A. Stanley Dolan, signed as "Acting Medical Superintendent," the letterhead on which said letter was written bearing the name, "Southern California State Hospital." The letter is attached and made a part of the affidavit. "Affiant is satisfied that if time is given him he can get the depositions of the officers of that

asylum to be used in this action, showing the insanity of defendant's brother, with the facts and circumstances, and form thereof. Affiant had learned to-day that Peter Corlskin, of Meadows, Idaho, has known defendant well and intimately, and will testify to the good character of defendant, and at least that he considered the defendant "off" at times, but the exact nature of his testimony affiant has been unable to learn, as the defendant gave him no information as to this witness, and affiant learned it from one of the witnesses now present, Mr. Goodman. That De Moss, one of the witnesses for the defendant, and for whom a subpoena was issued, has not been found, and affiant is informed that he is now in Walla Walla, Washington; said De Moss was a partner of defendant and lived with defendant in the same cabin, as defendant informed affiant, and was present just before defendant committed the alleged offense, and knows what occurred just prior to said alleged offense; that affiant has not been able to learn what said De Moss will testify to on account of the limited time which he has had to prepare the defense of defendant, and defendant has not been able to inform affiant as to what said De Moss will testify to, and defendant cannot safely go to trial without said witness."

The letter above referred to is as follows:

"Mr. Wetter, Borough of New Hope, Banks Co., Pa.

"Dear Sir: Charles A. Wetter, who is a patient in this hospital, has repeatedly written to his friends and received no reply. He is very much distressed and quite despondent from this fact. Will you please answer him? He was committed here under the name of Brainbridge. I enclose a letter addressed to me by him, which shows how he feels regarding this matter.

> "A. STANLEY DOLAN,
> "Acting Medical Supt."

The above letter is dated November 3, 1898, and from Patton, California. On the nineteenth day of September, this motion was denied. It has seemed best to give almost *verbatim* the showing made by the defendant in his affidavits

for a continuance of the case until a future term of the court, for the reason that his learned counsel insists that the court erred in not granting a continuance, and also in refusing his application to take the depositions of witnesses in Pennsylvania. An examination of the record convinces us that unless there is error in the orders of the court overruling defendant's motions for continuance, his application to take depositions or his instructions to the jury on the question of insanity, the judgment must be affirmed, as the record abundantly shows that unless the defendant was insane at the time of the commission of the homicide to such an extent that he was not responsible for his acts, the verdict of the jury was entirely justified. Indeed, counsel for defendant rests his entire argument on the alleged errors of the court in refusing to permit him to show that a brother of defendant had been committed to the insane asylum in California, at some time in the past, and the instructions of the court on the law where the plea of insanity is interposed. It is first argued by counsel for appellant tnat defendant was unduly forced to trial, and without sufficient time to prepare his defense. A careful reading of the affidavits in support of the applications for a continuance does not convince us that there is much merit in this contention; it is only shown that a continuance of the hearing of the case would result in establishing the fact that a brother of defendant had at some time been committed to an insane asylum in California. It is not shown or intimated the nature or cause of such insanity, or whether it was hereditary; unless hereditary, it would certainly be of but little assistance to defendant in his defense on the plea of insanity. In the order of the court denying defendant's application to secure the evidence of the close relatives of defendant in the state of Pennsylvania, it is stated that this "application was not made until after the cause was set down for trial, . . . . and the showing is too indefinite and uncertain as to what the defendant expects to prove by said witnesses." It will be observed that at no time or place in the record is it shown just what defendant expects to prove by his eastern relatives, excepting that a brother was confined in the asylum of California, and

a possibility that it may be shown that other instances of insanity might be traced in the past history of defendant's ancestors. Even if all these facts should be conceded by the prosecution, still, upon the trial evidence of witnesses who were intimately associated with defendant at and about the time of the alleged homicide, who heard what he said, observed what he did, his condition just prior to and immediately following the commission of the alleged crime, his threats and the reasons he gave for the commission of the act—all these would be considered by the jury in their efforts to determine the condition of defendant's mind, and whether or no he was in that condition mentally that he did not know he was committing a crime against the laws of nature and man. The mere fact that insanity may exist in his family is not of itself sufficient to excuse the defendant from the responsibility he owes to his fellow-men, neither would it avail him if he were able to prove by the witness, Peter Corlskin, that he was " 'off' at times."

The question to be determined in cases of this character is: Was the defendant at the time of the homicide so mentally unbalanced that he was not responsible to God or man for the commission of the act? If he mentally knew it was wrong to take the life of a human being, and under these conditions did commit the offense charged to him by the information, with malice, hatred or revenge, he is morally and legally responsible for the act and should suffer the consequences. He might be at times "a little off," and yet entirely responsible at the time of the commission of the crime charged to him. It might be that insanity existed in his family from its earliest history, and yet that would not excuse him. It would only be a circumstance in his favor to be considered with other evidence as to his past history, his language, acts and conduct at the time of the homicide and prior thereto. In fact, anything in his past life showing any indication of insanity should and would be considered by the jury. It would be a very dangerous precedent to say that because insanity existed in his family, he should have immunity; further than that it should be considered in connection with other evidence in the

case showing the condition of defendant's mind at and about the time of the homicide. It is true it would be a strong circumstance to show that he was not so mentally and morally depraved as to take the life of two human beings and attempt the life of the third, but nevertheless, it would still be incumbent upon him to show that legal insanity and not moral depravity prompted the act. Human life is very sacred in the eyes of the law, and whilst courts should always guard with the utmost diligence the rights of all parties charged with crime, at the same time they should be watchful of the rights of the people and not permit parties charged with homicide to go unpunished on the plea of insanity unless there is a foundation of fact, reason and justice to believe that the insanity was of such a character that the party pleading it was so mentally unbalanced that he was not responsible for his conduct. We do not wish to be understood as holding that hereditary insanity, or the insanity of a brother or sister, cr the insanity of any near blood relation of the party charged may not be shown; to the contrary, we are of opinion that such evidence is entirely competent, and when introduced should be carefully considered by the jury. The question is, Was the showing sufficient, under the facts in this case, to warrant the court in granting a continuance of the case or granting an order to take depositions, which would have necessitated a continuance until another term of the court? It will be observed that there is no positive statement that hereditary insanity exists in the family of the defendant. There is a positive statement that a brother of defendant had been confined in an insane asylum in California. This may have been an isolated case in that family. There are numerous causes for this dreaded malady, and by no means always traceable to heredity. Intoxication and self-abuse are frequently responsible for insanity. In this case learned counsel for the state in his oral argument in this court saw fit to refer to the defendant as having "crowbar" insanity—a specie with which we are not familiar—but doubtless he based it on the evidence of defendant who testified that at some time a crowbar had fallen on his head and thereafter it had affected his

mind at times.  Counsel for appellant cites Lawson's Criminal Defenses, volume 2, page 465; *People v. Garbutt,* 17 Mich. 9, 97 Am. Dec. 162, a Michigan case, by that eminent jurist and chief justice, Cooley.  We are in full accord with all that is said in that opinion, but the facts in that case and the one at bar are entirely different.  It is earnestly urged by counsel for appellant that he was not given sufficient time within which to prepare his defense.  It is shown that the alleged homicide was committed on or about the nineteenth day of July, 1904.  The preliminary examination was held on the first day of August, 1904.  The information was filed September 5th, and the time for trial fixed for September 19th thereafter.  It will thus be seen that counsel had from the first day of August until the time of the trial to correspond with the relatives of defendant in Pennsylvania.  The only information he could get was that they were unable to be present at the trial for "lack of money," as stated by the sister of defendant.  It seems that the family knew that a brother of defendant had been committed to. an insane asylum in the state of California in the year 1898, or was an inmate of said institution at that time as shown by a letter of the acting superintendent to the father of defendant.

It may be that the learned trial judge was satisfied that a continuance of the case until a future term of court would result in no benefit to defendant from any evidence he might procure from his relatives in Pennsylvania.  The evidence taken on the preliminary examination was accessible to him, and from that he may have been thoroughly convinced that any evidence of hereditary insanity in the family of defendant would be of little weight compared with the threats, actions and conduct of defendant at and about the time of the commission of the homicide, and it is not denied that defendant committed the act.  That the granting or refusing to grant a continuance is largely within the discretion of the court has long been settled in this state.  In *Territory v. Guthrie,* 2 Idaho, 432, 17 Pac. 39, in an opinion by Mr. Justice Broderick, it is said: "An application for a continuance is addressed to the sound judicial discretion of the court, and

appellate courts have uniformly refused to disturb a ruling on such questions, unless it appears that there was an abuse of discretion.'' Practically the same language is used in *People v. Walter*, 1 Idaho, 386, decided by our territorial supreme court in 1891. The last expression of this court to which our attention has been called is in *State v. Rice*, 7 Idaho, 762, 66 Pac. 87. On this subject the syllabus says: ''Refusal to grant a continuance being a matter legally within the discretion of the lower court, a judgment of conviction will not be reversed by reason of such refusal, unless it is apparent from the record that such discretion has been abused, and that defendant has been prejudiced thereby.'' The reason of this rule is so sound and well settled that a discussion would seem unnecessary. It has its origin in the fact that the trial judge is cognizant of all the facts and conditions existing from the earliest stages of the proceedings, and is presumed to enforce the law in such a manner that all parties charged with crime shall have a fair and impartial trial. It is equally his duty to see that the law is administered and guilty parties brought to justice and required to pay the penalty of their crimes without unnecessary delay.

It is urged by the attorney general and his associates that many witnesses could have been produced at the trial who were acquainted with the defendant at that time and for months just prior to the homicide; indeed, many witnesses were examined who were acquainted with defendant and who testified as to his threats, actions and conduct immediately before the commission of the act, and what he said. and did thereafter. With all these facts before us, can we say that the testimony of his father, mother or sister (who have not seen him for years) that a brother of defendant had been an inmate of an insane asylum; or the testimony of the superintendent of such institution that at one time he had in his care a brother of defendant; or the testimony of Peter Corlskin, that he thought at times defendant was ''a little off,'' could overcome the direct and positive statements of witnesses who were in his company and observed his actions, heard his language in the way of threats just prior to the homicide and

what he said after the commission of the act? We are of the opinion that the presence in court of all the witnesses whose testimony defendant asked time to procure would not have changed the result in the least.

In *State v. Rice, supra,* in the fifth clause of the syllabus, it is said: "An order denying a continuance upon the ground that a witness whose testimony is desired by the defendant is not ground upon which a reversal can be based, where it appears from the record that the testimony of such witness could not have changed the result of the trial." It is shown by the record that defendant testified that he attributed his trouble to an accident and not traceable to his parents or ancestors; that a crowbar had once fallen on his head and ever since he has had severe headaches accompanied by dizziness. That he fully knew and understood what he was doing is shown by the testimony of William Allen, who testified: "I heard him make threats about ten days before this. He always called Mr. Long 'this Dutchman.' He says: 'If that Dutchman ever comes over here I'll fix him plenty.' He was sitting in a wheelbarrow and the handle of a revolver was sticking out of his pocket. I could see it all the time. 'I have got a little thing right here that will do the business,' he says, 'I am carrying it on purpose for him.'" Other threats are shown, and it is also shown that after the homicide he met some parties on the trial and said to them: "I have meat over there; I think I have killed a Dutchman in the cabin; I don't know whether I got any more, they ran so fast; they were too swift for me." A number of witnesses testified that he had been drinking liquor that day and was intoxicated at the time he started to the cabin—the scene of the homicide.

In prescribing the duties of the court in applications to take testimony outside of the state and of the character of the one in this case, section 8181 of the Revised Statutes says: "If the court or judge to whom the application is made is satisfied of the truth of the facts therein stated, and that the examination of the witness is necessary to the attainment of justice, an order must be made that a commission be issued to take his testimony, and the court or judge may insert in the order a

direction that the trial of the indictment be stayed for a specified time, reasonably sufficient for the execution and return of the commission.'' With the discretion given the trial court to determine questions of this character, with the evidence of defendant himself that he only attributes the condition of his mind at times to an injury, with his threats repeated to different ones and his execution of them, we do not think the trial judge abused the discretion reposed in him by the refusal of the application for continuance or the refusal to grant the order to take testimony.

The next assignment of error is based upon the refusal of the court to permit the defendant to answer the following questions: ''Where was your brother the last you knew of him?'' The witness, prior to the question, had testified where he had resided for a number of years; that he had lived in Idaho county about ten years; was born in Pennsylvania; had no relatives in Idaho; his sister, brother in law, father and mother reside in Pennsylvania; that he had a brother not in Pennsylvania. Then follows the above question. The county attorney objected to the question as immaterial. The objection was sustained. It will be observed that there was no foundation laid for this question. The court was not informed of the purpose or why it was material. Until there is some reason shown why it was material where the brother of defendant was the last he knew of him, it was certainly immaterial, and there was no error in sustaining the objection.

Specification of error No. 6 is based upon the first instruction given by the court, to wit: ''Murder is the unlawful killing of a human being with malice aforethought. An unlawful killing means any killing of a human being which is not justifiable or excusable by the law as explained herein. The phrase 'malice aforethought' means a thing done with a wicked and corrupt motive. It is not confined to anger, hatred, and revenge by one against another, although it evidences a thing done through anger, hatred or revenge. It also evidences any other unjustifiable motive with which the act is done. Hence, malice is not confined to ill-will which

one individual holds toward another, but it is intended to denote any action flowing from a wicked and corrupt motive; a thing done with a wicked mind, when the act has been attended with such circumstances as evince plain indications of a heart which regards not its social duty, and which is fatally bent on mischief, is done with malice.'' It is suggested by counsel for the state that this instruction is almost a literal copy of the definition of malice found in Mr. Blashfield's excellent work on Instructions to Juries, volume 2, instruction 1482, page 611. An examination of this authority sustains the contention of the attorney general. Mr. Blashfield cites *Davis v. People,* 19 Ill. 73, 75; *Commonwealth v. Webster,* 5 Cush. (Mass.) 295, 52 Am. Dec. 711. We find no error in this instruction.

The objection most seriously urged by counsel for defendant to the instructions given by the court relates to the question of insanity, being Instruction No. 8. It follows: ''Under the plea of not guilty, testimony as to the sanity or the insanity of the accused may be introduced. Every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes until the contrary be proven to the satisfaction of the jury. To establish a defense on the ground of insanity, it must be clearly proven that at the time of committing the act the accused was laboring under such a defective reason from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know the nature and quality of the act, that he did not know he was doing what was wrong. By saying that it must be shown that he did not know he was doing what was wrong, the law means moral wrong. A man may want the capacity to distinguish between the various shades of illegality which the law assigns to a particular act, and yet be sane. This is not what is meant by the power to distinguish between right and wrong as one of the tests of sanity, and because an accused has not the mental capacity to know whether an act is legal or illegal, or believes his act to be legal, is no defense. The meaning of the law is that he had not the mental capacity

to know that he was doing a moral wrong. If his mind is not so diseased at the time of the killing as to prevent him from knowing the nature and quality of his act, or if he did know the nature and quality of his act that he was morally doing a wrong, he has sufficient mental capacity to be responsible for his acts. . . . . This last I will read again: If his mind is not so diseased at the time of the killing as to prevent him from knowing the nature and quality of his act, or if he did know the nature and quality of his act, that he didn't know he was morally doing a wrong, he has sufficient mental capacity to be responsible for his acts—or if he did know he was doing morally wrong, he has sufficient mental capacity to be responsible for his acts in so far as his insanity is concerned. If the defendant, at the time of the killing of Christ Long, was insane as above defined, he would not be guilty of either murder in the first degree or murder in the second degree, or manslaughter, and should be acquitted, and if from the evidence you have a reasonable doubt as to whether the defendant was insane you should acquit the defendant.''

Whilst this instruction is somewhat vague, and could have been given in fewer words and less argumentative, and with equal force and effect to the jury, still we think there was but one conclusion to be drawn from it, and that was: If he knew the nature and natural effect of his act, he was guilty; otherwise he should be acquitted. On the question of insanity, we refer to *State v. Larkins,* 5 Idaho, 200, 47 Pac. 945, and *State v. Shuff,* 9 Idaho, 115, 72 Pac. 664. The authorities are collated in these decisions and the position of this court clearly defined.

Of course that part of the instruction wherein the jury were told that: ''To establish a defense on the ground of insanity it must be *clearly proven* that at the time of committing the act the accused was laboring under a defective reason, etc.,'' was erroneous, and not the law. It is not incumbent on the defendant to ''clearly prove'' that he was insane, but, on the other hand, when he succeeds in establishing in the minds of the jurors a reasonable doubt as to his sanity, he is entitled to an acquittal. (*State v. Shuff,* 9 Idaho, .115, 72

Pac. 664.)   The remainder of the instruction correctly stated the law on the subject.   The erroneous portion of the instruction, however, could not have prejudiced the defendant in this case, for the reason that he utterly failed to show insanity or any indication thereof as existing at the time of the commission of the offense charged.   It must therefore follow that having failed to produce any evidence which would tend to raise in the minds of the jurors any doubt as to his sanity, the instruction on this point could not have prejudiced him in any respect.

Judgment affirmed.

Ailshie, J., and Sullivan, J., concur.