# THE PEOPLE *v.* ROMÁN.

## APPEAL from the District Court of Ponce.

### No. 357.—Decided April 8, 1912.

CRIMINAL LAW—INFORMATION—LIST OF WITNESSES FOR PROSECUTION.—There is no requirement of law making it mandatory on the *fiscal* to endorse on an information the names of all the witnesses of whom he has knowledge. It is sufficient if he endorses the names of those he has examined for the purpose of filing the information. Neither is this a requirement in California whence we derive our criminal jurisprudence.

CONTINUANCE OF TRIAL—SURPRISE OF DEFENDANT—WITNESSES FOR PROSECUTION NOT ENDORSED ON INFORMATION.—Although there was no error in not endorsing on the information the names of all the witnesses for the prosecution, yet if it should appear that the defendant was surprised by the introduction of witnesses whose names were not so endorsed this omission has great weight in determining whether the court did or did not abuse its discretion in refusing to continue the trial and to permit the defendant to obtain testimony in rebuttal.

ID.—NEW TRIAL—SURPRISE—CONTINUANCE OF TRIAL.—Motions for new trial on the ground of surprise and motions for continuance are governed by the same rules in criminal as in civil cases.

ID.—CONTINUANCE OF TRIAL—ABSENT WITNESSES—SUFFICIENCY OF MOTION.—When a motion is made for the continuance of the trial on the ground that several witnesses whom the defendant desired to introduce to rebut the testimony of witnesses for the prosecution are absent from the Island it is necessary to show that said absent witnesses will appear before the court at a subsequent term. The names of the witnesses and the facts concerning which they will testify should also be stated. The petitioner should also give evidence of good faith.

ID.—ABSENT WITNESSES—ADMISSION BY FISCAL THAT THEY WILL TESTIFY IN A CERTAIN MANNER.—When there are witnesses absent from the Island whom the defendant desires to introduce the continuance of the trial will be denied if the *fiscal* admit, not the veracity of their testimony, but that they will testify to certain facts.

ID.—TESTIMONY OF DEFENDANT—WITNESSES—DEFENDANT STANDING MUTE AS TO CERTAIN FACTS.—Courts are not inclined to regard as a presumption against the defendant his refusal to testify upon certain facts, but the moment that a defendant takes the stand as a witness he should be treated as any other witness and may be cross-examined, and his refusal to testify as to matters which he must necessarily know about may be commented upon and criticised.

ID.—CONTINUANCE—DISCRETION OF TRIAL COURT—EFFECT OF TESTIMONY OF DEFENDANT.—When the exercise of the discretion of the court in overruling a motion for a continuance is questioned and a confession of the crime is ascribed to the defendant and in testifying he fails to deny the making of such confession, this fact may be taken into consideration by this court in determining whether or not the court below committed an abuse of its discretion in denying the continuance.

ID.—WITNESSES—CREDIBILITY—IMPROBABLE STATEMENTS.—The improbability of the statements of a witness is not a sufficient reason for disregarding them although it may lesson their weight and credibility.

ID.—OCULAR INSPECTION—DISCRETION OF COURT.—The time and manner for an ocular inspection of the locality where the crime was committed is a matter within the sound discretion of the court, and the fact that the inspection was made in the daytime while the crime was committed at dusk is no abuse of such discretional power.

ID.—WITNESSES FOR PROSECUTION—FAILURE TO INTRODUCE SAME.—The *fiscal* is under no obligation to introduce all the witnesses named in the information.

The facts are stated in the opinion.

Mr. *Herminio Díaz Navarro* for appellant.

Mr. *Charles E. Foote, fiscal,* for respondent.

MR. JUSTICE WOLF delivered the opinion of the court.

At the trial in this case there was evidence tending to show that on March 9, 1910, Fernando Collazo was dicharged from the employ of Mr. Salazar, a merchant of the city of Ponce, because of a shortage in his accounts. He did not return to his father's house in the evening as was his custom. On the same day he disappeared and was never seen again alive. On or about the same day Mr. Salazar received a letter from Collazo announcing that under the circumstances he would have to go away. Along in April or May, 1910, the remains of a human body were found in a place called "La Flaca" near the Playa de Ponce. The skull and some of the other bones were missing from these remains. Subsequently a skull was found in a neighboring spot. The bones first found were identified as belonging to Fernando Collazo by the clothing and articles found in the pockets and other like signs. The skull was sufficiently identified by the dentist who had filled the teeth of the dead man. The skull contained a deep hole or fissure at the left occipital bone. There was a wide conflict of evidence at the trial between the experts of the prosecution and of the defense as to the manner in which this wound was produced. All the experts agreed that it had evidently caused the death of Collazo, but the experts of the Government gave evidence tending to show that the wound was produced by a heavy blow from a blunt instrument and

those of the defense that the death had been produced by a
bullet and was self-inflicted.  The pistol of Collazo with one
bullet discharged was independently found in still a third
spot.  The witness who found it kept it for some time and
was vague and uncertain in his statements as to the time and
manner of the finding.  It further developed that Fernando
Collazo and Alberto Román, the defendant, kept company with
the same mistress, Rosario Aneiro.  There was evidence tend-
ing to show that Román never entered the house of Rosario
of an evening until after Collazo had left there.  There was
evidence tending to show that the two men were inimical and
that Román perhaps a year before the trial had visited the
father of Collazo and had suggested that it would be wise for
his son, Fernando, to desist from going to see Rosario Aneiro.
There was, likewise, testimony to the effect that when one day
Román, standing on a sidewalk, saw Collazo and Rosario
Aneiro riding by in a carriage he lunged forward toward
them in a more or less threatening manner.

Pedro Olivera was a witness for the prosecution.  He tes-
tified that on the evening of March 9, between 7.30 and 8, he
saw Román and Collazo walking together in a somewhat re-
moved part of the Playa of Ponce near the cemetery in the
neighborhood where the remains of Collazo were found.  They
were walking together apparently in a friendly way at first,
but the witness knowing the relations that existed between
them on account of Rosario Aneiro was surprised to see them
together and curiously but fearfully followed them.  He was
about 50 steps behind.  They had some conversation which
the witness could not hear as the wind was contrary, and he
also observed the movement which Román made with his
hand in the manner indicated by the witness; but that he could
not tell whether it was with the object of striking Collazo.
They continued to walk and when they went by the road of
the cemetery they stopped again and Collazo made a move-
ment as if to turn back and Román sort of convinced him and
put his hand on his shoulder; that the witness took advantage

of this moment to hide himself to see what was going to happen; that he went to the left and passed them and hid himself in a ditch of a cane field that existed there. From the testimony a casual reader might obtain the impression that the witness was going in and out of ditches frequently, but he may be merely repeating himself, referring to the same ditch. When they arrived in front of a masonry house they had some words and the defendant said to Collazo: "You are a *sinvergüenza,* and you are going to pay me what you owe me," using the phrase in the sense probably understood by the jury that Román intended to get even with Collazo; that Collazo answered: "It is beyond belief that you (plural) have brought me here under false pretences," and as soon as he said that Román struck him on the body and then struck him another blow on the head, Collazo falling to the ground; that at this moment the witness heard a bolt thrown back as of a door that opened and shut and thereupon two persons came up from a guásima tree near by; that they were two men with caps similar to those of policemen; that he believes that they were policemen; that they had some words with Román that he could not hear and immediately the three took up the body, one by the legs and others by the hands and carried it, passing by the witness, the boy complaining bitterly; that upon passing some 8 or 10 steps from the witness one of these persons said to Román: "Notice that the boy is alive," Román replying: "Don't worry, let me take care of him;" that he did not see what they did with the body of Collazo and only saw when they were carrying it; that he was there for about half or three-quarters of an hour and that he saw the two persons with policemen's clothes come up very quickly; that he crouched down while they passed and when they went by he saw a carriage ahead and that when they arrived the carriage went off rapidly toward "Los Pámpanos"; that at this moment he looked and saw the defendant carrying something in his hand in the manner indicated by the witness going very

rapidly in the direction of the sea and that he did not see him again until the time of the trial.

This astonishing story was insisted upon by the witness on cross-examination. There were witnesses who contradicted some of the details of his account, but the bulk of his testimony remained unassailed.

Alberto Román was brought back from Cuba by extradition proceedings. He went there with Rosario Aneiro under the assumed name of González. He and Rosario had the same stateroom for a large part of the voyage and held themselves out to be man and wife, much to the surprise of the Porto Ricans who accompanied them, to whom Alberto Román was known.

During the imprisonment before the deportation of Román in the prison or "Vivac" at Santiago de Cuba two witnesses testified that one of them had an interview with him wherein the prisoner recounted certain facts previously admitted as true in the trial, namely, that the defendant went to Cuba under an assumed name with Rosario Aneiro; they discussed the defalcation of Collazo and the probability of his guilt; that in the trial for carrying concealed weapons the police had seized a club of defendant. Thereupon the witness, Carcasés, asked the defendant if he knew the report that the physician had made after the examination of the skull, and the defendant answered "no"; whereupon witness gave the defendant a newspaper, Diario de Puerto Rico, in which an account was found, whereupon the defendant exclaimed: "Carajo! they have caught me like a simpleton. I ought to have gone to Haiti where there is no treaty of extradition, and I came to Santiago de Cuba." When the witness arose to go the defendant begged him not to speak of what he had told the witness because it might compromise the defendant. This he said at the end, according to the witness, after his outburst.

The jury were given a view of the place where the events described by Olivera took place. There was no evidence of

the complicity of any other persons in the crime, except through the statements of this witness. There was no proof tending to connect any friends of Alberto Román with the crime and no further evidence to prove the existence of the carriage that took away the alleged policemen. It was proved that Olivera did not speak of his experiences on the evening of March 9 until a couple of months thereafter. He accounts for his silence because of his fears. He was under the surveillance of the police from the time he made his disclosure up to the time of the trial.

Two witnesses testified that they saw Alberto Román in the neighborhood of the theatre on a certain night when a religious performance was going on at about 8:30 or 9 and the counsel for the defendant took the stand to say that he had verified that the religious performance took place on the night of March 9. The jury would know how long it took to go from the Playa to Ponce.

With these facts there was sufficient evidence tending to show the guilt of the defendant. The appellant alleges, however, first, that the court erred in permitting witnesses to testify whose names were not indorsed in the information, especially as among these names the witnesses Carcasés and Callejas were not included; second, that the court erred in not granting a continuance to permit defendant to obtain testimony impeaching the evidence of the witnesses Carcasés and Callejas; third, that the evidence of the witness Olivera is so improbable, confused and contradictory as not to merit credibility, and that without such testimony there would not be sufficient evidence to find the defendant guilty beyond a reasonable doubt.

With respect to the question of indorsing the names of the witnesses there is no requirement of law making it mandatory on the *fiscal* to indorse all the witnesses of whom he has knowledge. It is sufficient if he indorses the names of those that he examined for the purpose of filing the information. In some States indorsement is a positive requirement

of law; but this is not the case in California, from which we derive our jurisprudence. *People* v. *Symonds*, 22 Cal., 349; *People* v. *Jocelyn*, 29 Cal., 564; *People* v. *Kent*, 10 P. R. R., 343. While there was no technical error, yet if it should appear that the defendant was in fact surprised by the introduction of witnesses whose names were not indorsed on the information, this failure to indorse ought always to have great weight in determining whether the court did or did not abuse its discretion in refusing to continue the case and to permit the defendant to obtain contradictory or impeaching testimony.

We come then to the application of the defendant for a continuance.

After the jury was sworn the attorney for the defendant, Mr. Canals, presented an affidavit wherein he set forth that on arriving at his office on the morning of the trial he inadvertently opened a letter which was addressed to the *fiscal* in care of the affiant; that the said letter was postmarked "Cuba" and had arrived from Cuba the day before; that the writer of the letter, who occupied the position of substitute of the chief of the *"Vivac"* emphatically denied alleged conferences with respect to the crime of which Alberto Román is accused and alleged to have taken place in the said jail of Santiago de Cuba; that he had information from persons entirely worthy of belief that the persons to whom the letter refers, Messrs. Carcasés and Callejas, were to be used at the trial as witnesses of the prosecution with regard to the conference of which mention has been made; that given the importance in the result of this case which the testimony of such witnesses might have it was necessary to give the defendant an opportunity to impugn the said testimony with the declarations of the person who signed such letter and that of the chief of the department where the interview took place; wherefore the affiant prayed that the case be continued unless the district attorney agreed not to use such witnesses at the trial. The court overruled the application.

After the said witnesses, Carcasés and Callejas, had testified at the trial the foregoing motion was renewed but without additional affidavits. After the jury had found defendant guilty a motion for a new trial was filed, and one of the grounds for the motion thereof was the failure of the court to continue the case to permit the defendant to obtain impeaching testimony with respect to the alleged confession or conference; that the motion also included an application to permit the defendant to obtain time for the purpose of obtaining impeaching affidavits. Accompanying the motion for a new trial was an affidavit of Alberto Román which sets forth substantially as follows:

That after the trial in this case had begun he had received reliable information that three employes of the jail of Santiago de Cuba, where the defendant had been held, were disposed to come to Porto Rico and appear before any court to prove the falsity of the admissions or confession of the defendant to which the testimony of the witness, Porfirio Carcasés, refers; that such witness was brought for that purpose from Cuba to testify in such cause without the defendant having definite knowledge until after the trial had commenced that such witness was going to be utilized against the defendant, nor of the matters about which his testimony would relate, nor was the name of this witness indorsed on the back of the information, nor was the defendant at any time informed that he was going to be used by the prosecution; that the verdict in this case could not fail to be powerfully affected by the admissions or confession of the defendant which said Porfirio Carcasés recounted, sustained and corroborated in his declaration by another witness named Callejas also brought from Cuba under the same conditions of surprise for the defendant as Carcasés; that the employes of the jail or "*Vivac*" of Santiago de Cuba above-mentioned are Alfredo García, chief of the jail; Antonio Palomo, substitute chief of the same institution, and Benigno Aparicio, also an employe of the same "*Vivac*"; that their affidavits would be in sub-

stance as follows: That they knew Alberto Román; that he was incarcerated there; that he had occasion to confer with Porfirio Carcasés; manner in which such conference took place; that Antonio Palomo and Benigno Aparicio know that the defendant made no admissions or confession to Porfirio Carcasés; that Alfredo García knows that no person by the name of Callejas was present at such conference, and that only Antonio Palomo was present during the whole interview and Benigno Aparicio during a part; that the defendant has the offer of one of these persons, Antonio Palomo, and through him of the other two, to come and testify about the matter indicated at any moment that he is called for that purpose.

When the application of continuance was originally made to the court it is plain that the court did not have enough before it to justify the granting of the same. Neither the names of the witnesses nor the matters to which they would testify were set out in the affidavit. The prosecution had no opportunity to admit the truth of the affidavits, to make any offer whatsoever, nor to present counteraffidavits. No sufficient showing was made that the alleged witnesses could be obtained at a subsequent term of the court. There was no statement either on information or belief; or otherwise, to the effect that the defendant had never made any admission or confession to any person by the name of Carcasés, nor to any other person while confined in the jail at Santiago de Cuba. Of course, it would have been somewhat difficult for the defendant to have denied statements of witnesses who had not testified; but a similar consideration applies to the failure of the court to continue the case. There was no affidavit that the motion was not made for delay. The court could not judge of the materiality or the importance of the testimony at this stage of the trial. There was little or nothing before the court to show that the application was made in good faith. There was no statement that the letter was not obtained by the procurement of the defendant. The failure to make such a denial leaves room for the inference that the defendant may

have known a long time before the trial the nature of the testimony to be given by the Cuban witness. If he had such knowledge before the trial, as the subsequent affidavit presented with the motion for a new trial seems to indicate, then the defendant was plainly lacking in diligence in not making his application until after the jury was sworn. The affidavit accompanying the motion for a new trial averred that the defendant had not had time to communicate with Cuba. Yet he states the nature of the testimony to be produced. The application for a continuance was, from all that has been said, so defective legally that the action of the court in refusing the same cannot be considered as an abuse of discretion.

Similar considerations would apply to the second application. While the court knew the nature of the testimony the legal requisites and good faith on the part of the defendant were still undemonstrated. A doubt might well remain in the mind of the court whether the application was a genuine one.

The defendant failed to give satisfactory proof that he was surprised by the testimony of the Cuban witnesses. Motions for new trials on the ground of surprise and motions for continuance are governed by the same rules in criminal as in civil cases.

The courts of Texas have a rule whereby when an application for a continuance is made and denied, the action of the court is supported or reversed depending upon the facts of the trial. *Hyde* v. *State,* 16 Tex., 446; *Land* v. *State,* 34 Tex. Crim., 340; *Hooper* v. *State,* 29 Tex. Crim., 614. In considering questions of continuance other courts are more or less influenced by similar principles, and such a state of law is bound to arise because questions of continuance involve the sound discretion of the court. *State* v. *Rice,* 7 Idaho, 762; *State* v. *Wetter,* 11 Idaho, 433, 83 Pac., 341; *People* v. *Francis,* 38 Cal., 183; *State* v. *Fleming,* 17 Idaho, 471; 106 Pac. 305; *State of Montana* v. *Gibbs,* 10 Mont., 210, 10 L. R. A., 749, see note; *Territory* v. *Shankland,* 77 Pac., 492. We shall consider the motion for a new trial with respect to the

failure of the court to continue in a similar light. In the motion for a new trial the sources of information by which the defendant knew the matters to which the witnesses would testify are undisclosed. These sources of information were very important to permit the court to determine whether or not the application was for the mere purpose of delay, whether or not the witnesses would appear at the trial, and whether or not the defendant had been duly diligent before the trial. Nowhere in these affidavits does the defendant deny the truth of the statements of the witness, Carcasés, but confines himself to implying that the appearance at the trial of the Cuban witnesses was a surprise to him and to telling the matters to which they would testify. Examining his affidavits further it would appear that the only person who was present during the whole of the alleged interview between Carcasés and Román was Antonio Palomo. The latter denies that Alberto Román made an admission or confession. There is a wide current of authorities that when the witnesses who are desired for the trial are beyond the jurisdiction of compulsory process that it is sufficient if the prosecuting attorney admits, not the truth of the statements, but that the witnesses would so testify. *Fanton* v. *State,* 36 L. R. A., 158; *State* v. *Fleming,* 17 Idaho, 471, 106 Pac., 305; *State of Montana* v. *Gibbs,* 10 Mont., 210, 10 L. R. A., 749, see note; *People* v. *Savant,* 112 Mich., 297; *Hoyt* v. *State,* 140 Ill., 588, 16 L. R. A., 239, and note. See 9 Cyc., 182. Independently of these authorities our own Code of Civil Procedure, in section 202, lays down the same rule. Matters of postponement in civil and criminal trials are governed by the same principle.

In the large majority of cases it is self-evident that the defendant ought to have the personal attendance of witnesses. This is especially true where the witnesses are wanted with respect to some matter connected with the commission of the crime itself. Where, however, as here it is a question of the mere denial of certain statements made by the defendant the solemn admission that the substitute chief of the prison

at Santiago de Cuba would testify that he was present at the conference and that such admissions were not made, as testified to by Carcasés, would seem to meet the ends of justice. The public has an interest in the speedy trial of cases. It was not proposed to impugn the veracity or the character of the witness, Carcasés, in any other way than by denying a fact to which he testified. Such a denial could have been overcome by an admission of the prosecuting attorney that the witnesses would testify as offered. If the practice of admitting that the witnesses would testify as offered were never permitted trials could be indefinitely postponed at the will of the defendant where the witnesses reside in distant parts. *Hyde* v. *State,* 16 Tex., 446; *People* v. *Francis,* 38 Cal., 183. Because of the failure to set out the sources of information the court could very well doubt if the witnesses would be produced or that if they came they would change the result of the trial. The court had a right to consider the manner and bearing of the witnesses in testifying and their probable truthfulness, and such consideration applies also to the Cuban witnesses. In this regard there is one very important consideration. After the close of the case of the prosecution and after a number of his own witnesses had testified the defendant took the stand. His testimony was limited to explaining why he went to Cuba under a false name. He was silent as to every other aspect of the case. His silence was bound to affect the jury and would be bound to affect the mind of the judge who tried the case. While the court will proceed slowly in making any presumption against the prisoner from his failure to testify as to all matters when taking the stand (*Balliet* v. *United States,* 129 Fed. Rep., 695) the universal current of authorities is that where the defendant takes the stand he is to be treated like any other witness. *Reagan* v. *United States,* 157 U. S., 305; *Brandon* v. *People,* 42 N. Y., 265; *Stover* v. *People,* 56 N. Y., 315; *McGarry* v. *People,* 2 Lansing [N. Y.], 227; *State* v. *White,* 27 Am. Rep., 137, and notes page 144; *Price* v. *United*

*States*, 14 D. C., Appl., 391; *Mirando* v. *State*, 50 S. W., 714; *Quintana* v. *State* 29 Tex Crim., 401; *Commonwealth* v. *Nichols*, 114 *Mass.*, 285; 19 Am. Rep., 346, and notes; *Woburn* v. *Henshaw*, 101 Mass., 462; *People* v. *Freshour*, 55 Cal., 375; *Commonwealth* v. *Bonner*, 97 Mass., 587; *Commonwealth* v. *Morgan*, 107 Mas., 199; *Commonwealth* v. *Mullen*, 97 Mass., 545; *Connors* v. *People*, 50 N. Y., 240; *People* v. *Casey*, 72 N. Y., 393; *Heldt* v. *State*, 30 N. W., 626; *State* v. *Ober*, 19 A. R., 88. A number of the foregoing cases and others are quoted with approval by the Supreme Court of the United States considering a similar matter in the very recent case of *Powers* v. *United States*, February 19, 1912. The defendent waives his privilege and may be cross-examined in full and comment may be made on his failure to explain a thing conspicuously in his knowledge. *Brandon* v. *People*, 42 N. Y., 265; *Stover* v. *People*, 56 N. Y., 315; *State* v. *Duncan*, 38 Am. Rep., 895, notes; *Lienburger* v. *State*, 21 S. W., 603. This principle, of course, should not be extended to make the privilege of the defendant his undoing. Probably the court should not be too ready, in determining whether or not there is a preponderance of evidence against the defendant, to lay too much stress on his failure to testify to certain points even if they should be somewhat material; but where the question of the sound discretion of the court is involved and where a confession is ascribed to the defendant and he takes the stand and fails to deny the making of such confession, such a fact may be taken into consideration by this court in weighing whether or not the court below committed an abuse of discretion in denying the application  If he had denied the statement of Carcasés there would simply have been oath against oath. He has not only failed to make such a denial but in his affidavit filed with the motion for a new trial he failed to deny the truth of the statement of Carcasés. From the manner in which the letter was produced, from the bearing of the witnesses including the defendant, from their

statements and omissions, the court had a right to consider whether or not there was a probability of the result of the trial being changed or affected by giving the defendant the opportunity to produce these foreign witnesses. We find no abuse of discretion. The court had a right to believe under the circumstances that it did not lie in the power of the defendant to controvert the statements of Carcasés and Callejas.

The story of the witness, Pedro Olivera, contained some very impropable circumstances; but the improbability of the statements of the witness is never, as a matter of law, a sufficient reason for disregarding them, although it may diminish their weight and credibility. *State* v. *Adair,* 61 S. W., 187; *Bishop* v. *State,* 43 Tex., 390. His story is confirmed by the medical experts of the Government inasmuch as they bear out that the wound must have been produced by a blunt instrument. To utterly disbelieve his testimony one would have to believe him either to have a motive against the defendant or that he is a visionary or a madman. Of any of these theories there was not the slightest evidence beyond his testimony itself. He was carefully cross-examined and gave a circumstantial story although it is reproduced in the record in a somewhat vague manner. But the jury heard him and they also visited the place he described, and under the facts of the case we can see no reason to disturb their verdict on the ground of the improbability of this witness's story.

Besides the exception with respect to the failure of the prosecution to indorse the names of all its witnesses the appellant in his brief presents three other grounds of error. The first of these was that in granting the ocular inspection or view the court ought to have ordered that such view take place at the exact time to which the witness Olivera referred, namely, between 7.30 and 8 p. m. Counsel urge that such view would have been the only best proof. We do not so understand the rule of best evidence. If the theory of the de-

fense were followed up the same atmospheric conditions and the same conditions overhead would have to be reproduced. Moreover, the idea of the view may have been to permit the jury to ascertain the topography of the country where the events described took place, and such an inspection would be made to the greater advantage of the truth if it was done in broad daylight. It was a matter within the discretion of the court and we find no abuse in the manner of its exercise.

Appellant maintains that the *fiscal* should have been required, upon the motion of the defense, to examine or present at the trial all the witnesses whose names were indorsed on the information. We find no authority in the laws of Porto Rico or of any State of the United States demanding such a practice. The authorities are to the contrary. *People* v. *Quick,* 51 Mich., 547; *Bressler* v. *People,* 3 N. E., 521, The defendant had the right to make appropriate comment to the jury on the failure of the prosecution to produce any witness whose name was so indorsed.

The only other exception on which appellant insists is that the court erred in striking out certain impeaching testimony. The defendant, to prove the unreliability of Pedro Olivera, introduced the witness Francisco Parra Capó who testified that Pedro Olivera came to see him on behalf of a person with the nickname of "Cubano," who was imprisoned in the jail of Ponce for counterfeiting and who, a year later in company with Olivera, came to see said Parra and in front of Olivera said that he had been making false coin for some time and asked Parra's aid to obtain the necessary material for that purpose offering to return the same manifold. But it also appeared from the testimony of Parra Capó that the "Cubano" had been acquitted, that Pedro Olivera had been instrumental in bringing the "Cubano" to Parra, to permit him to offer his thanks for directing him to the attorney who helped acquit him; that Olivera said nothing at the interview, and that his principal part had consisted in making the "Cubano" express his thanks. There was nothing to show that

Olivera and the "Cubano" were intimate friends or companions in crime or that Olivera was the go-between of the "Cubano." This testimony was not relevant nor material and was too remote. That Pedro Olivera should have aided the "Cubano" when the latter was in trouble and should have come with him to bring him to Parra to express the thanks of an acquitted man would speak in favor of Olivera, rather than against him. In any event the testimony of Parra did not have the legal effect of discrediting the witness, Pedro Olivera.

The charge to the jury was full and not objected to and we find no error in the same.

The jury heard the evidence. They heard the witnesses for and against the defendant. They weighed all the circumstances including the alibi of the defendant. There was considerable conflict in the evidence, but the jury, carefully instructed, found the issue against the defendant and finding nothing in the record nor the evidence which shows passion, prejudice, partiality or manifest error, we feel bound to affirm the judgment.

*Affirmed.*

Chief Justice Hernández and Justices del Toro and Aldrey concurred.

Mr. Justice MacLeary expressed his concurrence in the judgment on the ground that the records do not show that the trial court has committed any abuse of its discretional power or that material error had been committed.