[No. 7241-2-I. Division One. September 29, 1980.]

THE STATE OF WASHINGTON, *Respondent*, v. RODNEY K. CRENSHAW, *Appellant*.

---

*Rusing & Platte* and *Richard C. Platte,* for appellant.

*David S. McEachran, Prosecuting Attorney,* for respondent.

DURHAM–DIVELBISS, J.—The defendant, Rodney Crenshaw, was convicted of the first degree murder of his wife, Karen Crenshaw, to whom he had been married only a few weeks. He appeals, having pleaded not guilty and not guilty by reason of insanity to the charge below.

The defendant, who was 28 years old at the time of the offense, has a history of mental problems. He was hospitalized in his home state of Texas 15 times between 1970 and 1978, where he was diagnosed as a schizophrenic, paranoid type.

The couple married on August 10, 1978, in Texas and went to Canada. While there, the defendant became involved in a fighting incident and was deported to the United States, leaving his wife behind temporarily. He went to Blaine, Washington, registering at a motel on August 25, 1978. The victim arrived 2 days later. In his taped confession, the defendant said that when he met the victim he sensed that "it wasn't the same Karen" and that "she had been with someone else." The defendant did not ask the victim any questions about the infidelity he suspected. Instead, the couple went immediately to the motel where the defendant beat the victim until she was unconscious. He then went to a nearby natural food store to obtain a knife, returned, and stabbed the victim 24 times. The defendant left again, drove to a nearby farm where he had

been employed to clear brush, and obtained an ax by telling the farmhand that the owner had told him to get the ax so he could do some more work. The defendant returned to the room and decapitated the victim, leaving ax marks that went 1/4 inch deep into the concrete floor underneath the 1-inch carpeting.

At about 6:30 p.m. that same day, the defendant went to a nearby gas station and borrowed a bucket and sponge, saying that he had a mess to clean up. When the motel manager went to defendant's room between 7:30 and 8 p.m. that night to inquire about his telephone bill, he observed the carpet was "squashy" and he smelled ammonia, but he did not ask the defendant any questions. Police later testified that the room had been washed down so thoroughly that they could not obtain fingerprints.

Later the defendant hid the victim's body under some brush in a drainage ditch about 25 miles from Blaine, and then drove to the Hoquiam area, about 200 miles from the scene of the crime. On the afternoon of August 29, 1978, he picked up two hitchhikers to whom he related that he had just decapitated his wife because she had been unfaithful, and that he wanted to get rid of the car he was driving because it was his wife's car. One of the hitchhikers assisted the defendant in pushing the car off of the Hoquiam bridge. While leaving the bridge, they spotted a police car and defendant ran away. Police apprehended him in the Hoquiam area the next day, at which time he identified himself as "Tristan Shantee." He voluntarily confessed to the crime on September 2, 1978.

The defendant was sent to Western State Hospital on September 5 to obtain psychiatric evaluations as to his competency to stand trial. On October 27, 1978, the trial court ruled him competent to stand trial. On December 7, 1978, the trial court denied his motion for acquittal on grounds of insanity.

At trial, the defendant testified that he was of the Moscovite religious faith, and that it would be improper for a Moscovite to not kill his wife if she committed adultery. He

said that it would be a "little better" to use an ax for that purpose, so that the victim's head would not communicate anymore. He testified that he did not believe in divorce under any circumstances, and that divorce is "harder than death on people." In his taped confession, which was admitted into evidence and played before the jury, the defendant said that he had told the victim before they married that if he ever caught her being unfaithful to him he would shoot her, and that she should likewise shoot him if she ever caught him being unfaithful to her.

The jury found defendant guilty of murder in the first degree. The court rendered judgment in accordance with the verdict, and sentenced defendant to life imprisonment.

The defendant makes nine assignments of error, which we have grouped into four categories: (1) competency to stand trial; (2) evidentiary rulings; (3) the insanity defense; and (4) sufficiency of the evidence.

### COMPETENCY TO STAND TRIAL

First, the defendant assigns error to the trial court's determination that he was competent to stand trial.

RCW 10.77.010(6) defines incompetency as follows:

"Incompetency" means a person lacks the capacity to understand the nature of the proceedings against him or to assist in his own defense as a result of mental disease or defect.

The determination that an accused is competent to stand trial is within the trial court's discretion, and will not be reversed on appeal absent manifest abuse of discretion. *State v. Hanson*, 20 Wn. App. 579, 581 P.2d 589 (1978). We normally defer to the trial court's competency determination because the trial court can personally observe the individual's behavior and demeanor. *Hanson*, at 582.

At the competency hearing, all three physicians appointed by the court to examine the defendant testified that the defendant understood the nature of the proceedings against him and was able to assist in his own defense. When defendant himself took the stand, he was asked why

he was in court that day, and he replied, "[w]e're in court to see whether I'm mentally capable of going to a trial." Based upon our review of the entire record, we conclude that the trial court acted completely within its discretion in finding defendant competent to stand trial.

The fact that defense counsel expressed reservations about defendant's competency to stand trial at the original arraignment, and at the hearing to determine if further psychiatric evaluations were necessary, does not alter our opinion. Defense counsel did not express any such reservations at the competency hearing itself, and at the other hearing mentioned above, defense counsel said that he "[could not] honestly say that I've spent the time with him that would really perhaps be an adequate basis for a strong opinion on his competency, . . ." A lawyer's opinion as to his client's competency and ability to assist in his own defense is a factor which should be considered and to which the court must give considerable weight. *State v. Israel,* 19 Wn. App. 773, 577 P.2d 631 (1978). Nevertheless, the primary test to be applied is whether the court engaged in a manifest abuse of discretion, *State v. Hanson, supra,* and no such abuse appears here.

In addition, the trial record bears out the court's pretrial competency determination. Although defendant often interrupted or distracted courtroom proceedings (*e.g.,* by repeating "[y]our mother, your mother, your mother"), there is a distinction between explosive behavior and incompetency to stand trial. The defendant, by many of his own actions at trial, demonstrated he understood the nature of the proceedings against him and was able to assist in his own defense.

### EVIDENTIARY RULINGS

■■ The defendant next assigns error to the trial court's exclusion of three items of testimony proffered by the defense. The first was a telephone conversation between the defendant and his mother in which he kept saying, "quit shooting me, mother," and the second was a portion

of Dr. James A. Hunter's deposition in which he testified that in his opinion, defendant was a latent homosexual. The trial court excluded both of these items on its own motion when the defendant became disruptive and interrupted the proceedings with his personal objections to the proffered testimony. The trial court did not err by rejecting evidence even though no objection had been made by the prosecuting attorney. *State v. Frost,* 134 Wash. 48, 234 P. 1021 (1925). This evidence was merely cumulative, and the trial court acted within its discretion in excluding it. *State v. Freeman,* 17 Wn. App. 377, 563 P.2d 1283 (1977).

▮ The third item of testimony was a telephone conversation between the defendant's mother and the victim shortly before her death in which the victim said that the defendant was upset by her menstrual periods and had told her to stop them. The State's objection to the admission of such testimony on hearsay grounds was sustained. The defendant's argument that the excluded testimony is admissible under the present sense impression and excited utterance hearsay exceptions cannot be considered because it is made for the first time on appeal. *State v. Malone,* 20 Wn. App. 712, 582 P.2d 883 (1978).

The defendant next contends that it was error to allow Letha Guthrie's lay opinion as to his sanity at the time he obtained the ax from her on August 27 because the State did not lay a proper foundation. We do not agree: Prior to eliciting her opinion that the defendant "seemed very normal" when he borrowed the ax, the State elicited the facts to form a sufficient basis for her opinion, including her working relationship with the defendant and the details of her encounter with the defendant on August 27.

▮▮ Defendant also argues that it was error to admit Blaine Police Chief Hinchey's lay opinion as to defendant's sanity at the time of the offense because Hinchey lacked testimonial knowledge. It is well established in Washington that a lay witness may testify concerning the sanity or mental responsibility of others, so long as the witness' opinion is based upon facts he personally observed, and the

witness has testified to such facts. 5 R. Meisenholder, Wash. Prac. § 342, at 319 (1965); *State v. Odell,* 38 Wn.2d 4, 227 P.2d 710 (1951); *State v. Wilkins,* 156 Wash. 456, 287 P. 23 (1930); *State v. Brooks,* 4 Wash. 328, 30 P. 147 (1892). Chief Hinchey met the defendant in the Hoquiam jail, drove him to Whatcom County, and took his confession. This provided ample opportunity for him to observe the defendant soon after the offense. The State did not ask Chief Hinchey his opinion as to defendant's sanity at the time of the offense until redirect examination, after defense counsel had extensively cross–examined him on whether the defendant had displayed an inability to distinguish right from wrong, with respect to the offense, in his presence. The defendant thus "opened the door" for the State's questioning of Chief Hinchey as to the sanity of the defendant at the time of the offense. *State v. Gefeller,* 76 Wn.2d 449, 458 P.2d 17 (1969).

■ Similarly, the defendant challenges the testimonial knowledge of the three physicians appointed to examine him. Dr. Donald F. Allison, a psychiatrist, and Dr. Brett Trowbridge, a clinical psychologist, examined the defendant at Western State Hospital on September 5 and 6, 1978, respectively. Dr. Nathan Kronenburg, a psychiatrist, examined the defendant on October 4, 1978. The trial court's admission of their expert opinions as to defendant's sanity at the time of the offense was not an abuse of discretion. Each witness testified based upon his personal review of voluminous records and upon his interview with the defendant. Psychiatric opinion evidence regarding a defendant's mental condition at a particular point in time is admissible when relevant to the question of a defendant's sanity even though the expert witness did not personally observe the defendant at the time of the offense. *State v. Upton,* 16 Wn. App. 195, 556 P.2d 239 (1976).

Finally, the defendant challenges the trial court's admission into evidence of five color photographs of the victim's decapitated body. He contends that five photographs are too many because the State overwhelmingly proved its case

even without the photographs, which are without probative value, and were introduced for their shock value and prejudicial effect.

■ Competent evidence is not inadmissible merely because it is gruesome; pictures that are accurate representations are admissible if they are probative of some element of the crime. *State v. Adler,* 16 Wn. App. 459, 558 P.2d 817 (1976); *State v. Griffith,* 52 Wn.2d 721, 328 P.2d 897 (1958). The test for admissibility is whether the probative value of the photographs outweighs their probable prejudicial effect. *State v. Adams,* 76 Wn.2d 650, 458 P.2d 558 (1969), *rev'd on other grounds,* 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273 (1971); *State v. Tikka,* 8 Wn. App. 736, 509 P.2d 101 (1973). The admission or rejection of photographs lies largely within the sound discretion of the trial court, and in the absence of a showing of abuse of discretion, the trial court's ruling will not be disturbed on appeal. *State v. Adler, supra; State v. Griffith, supra.*

Although these photographs are decidedly unpleasant, we do not believe the trial court abused its discretion by admitting them into evidence. The trial court showed it was sensitive to the danger of inflaming the jury by rejecting exhibit 21, a photograph of the decapitated head by itself, due in part to its appearance and in part to testimony that death was caused by stabbing, not decapitation. The admitted photographs are no more gruesome than the facts, and their probative value outweighs their potential prejudicial effect. As our State Supreme Court has stated:

> A bloody, brutal crime cannot be explained to a jury in a lily–white manner to save the members of the jury the discomforture [*sic*] of hearing and seeing the results of such criminal activity.

*State v. Adams, supra* at 656.

### THE INSANITY DEFENSE

■ Defendant first argues that the trial court erred by instructing the jury on a presumption of sanity because his previous institutionalization for nearly 7 years entitled him

to an instruction on a presumption of insanity. The presumption of sanity is well established in Washington. Even evidence of prior criminal insanity commitments, resulting in a defendant's release after he was deemed sufficiently recovered, does not, merely by its introduction, eradicate the presumption of sanity. *State v. McDonald,* 89 Wn.2d 256, 571 P.2d 930 (1977). Insanity must be established as an affirmative defense. RCW 9A.12.010.

▬▬ Defendant next contends that we should apply the American Law Institute (ALI) insanity test, rather than the *M'Naghten* insanity test. Such a contention cannot be considered inasmuch as defense counsel failed to request an instruction based upon the ALI test below. *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968), *vacated as to imposition of death sentence,* 408 U.S. 934, 33 L. Ed. 2d 747, 92 S. Ct. 2852 (1972).

Defendant's final assignment of error in this area concerns the insanity instruction. The jury was instructed that:

> In addition to the plea of not guilty, the defendant has entered a plea of insanity existing at the time of the act charged.
> Insanity existing at the time of the commission of the act charged is a defense.
> For a defendant to be found not guilty by reason of insanity you must find that, as a result of mental disease or defect, the defendant's mind was affected to such an extent that the defendant was unable to perceive the nature and quality of the acts with which the defendant is charged or was unable to tell right from wrong with reference to the particular acts with which defendant is charged.
> What is meant by the terms "right and wrong" refers to knowledge of a person at the time of committing an act that he was acting contrary to the law.

Instruction No. 10. This instruction conforms to WPIC 20.01, 11 Wash. Prac. 137 (1977), except for the final paragraph, which was added by the trial court. The defendant contends that it was improper for the trial court to elaborate upon the pattern instruction because it increased defendant's burden of proof and buttressed the State's

case. This contention cannot be considered on appeal as it was not raised in the trial court. *State v. Worland,* 20 Wn. App. 559, 582 P.2d 539 (1978).

 The defendant also raises a question of first impression in Washington: what is meant by the terms "right" and "wrong" in the *M'Naghten* test.[1] He argues that the trial court erred by defining these words to the jury in the legal, rather than in the moral sense. The courts from other jurisdictions are divided on this issue. Some courts have held that "wrong" should be restricted to mean "legally" wrong.[2] Other courts have held that "wrong"

---

[1]Professor Arval Morris has suggested that our State Supreme Court adopted the "morally" wrong definition when it approved a jury instruction providing that one was legally insane if "his mind was diseased to such an extent that he was *unable to perceive the moral qualities of the act with which he is charged,* and was unable to tell right from wrong with reference to the particular act charged." (Italics ours.) *State v. Davis,* 6 Wn.2d 696, 708, 108 P.2d 641 (1940), quoted in Morris, *Criminal Insanity,* 43 Wash. L. Rev. 583, 603 (1968). This test was subsequently approved in *State v. Tyler,* 77 Wn.2d 726, 466 P.2d 120 (1970), *vacated as to imposition of death sentence,* 408 U.S. 937, 33 L. Ed. 2d 756, 92 S. Ct. 2865 (1972); *State v. Reece,* 79 Wn.2d 453, 486 P.2d 1088 (1971); and *State v. Quinlivan,* 81 Wn.2d 124, 499 P.2d 1268, 72 A.L.R.3d 835 (1972).

We respectfully disagree with Professor Morris, however, as we do not believe that our State Supreme Court has adopted any definition of "wrong" for the *M'Naghten* test. No Washington court has ever been presented with the question before us today. In *State v. Davis, supra,* for example, the question was only whether that instruction increased the defendant's burden of proof. Moreover, the instruction approved in *Davis* differs from the *M'Naghten* rule as it is applied today. *See State v. White,* 60 Wn.2d 551, 596–97, 374 P.2d 942 (1962) (Hunter, J., concurring in part and dissenting in part), *cert. denied,* 375 U.S. 883, 11 L. Ed. 2d 113, 84 S. Ct. 154 (1963). The *Davis* instruction and the others similar to it were approved while legal insanity was being defined by the courts rather than the legislature. Even though our courts have consistently purported to follow *M'Naghten,* various expressions of the rule have been approved over the years, and some not entirely in conformance to *M'Naghten. See* Comment, *The Spirit of M'Naghten,* 9 Gonz. L. Rev. 806 (1974). Now that the legislature has codified the *M'Naghten* rule in RCW 9A.12.010, the *Davis*–type instruction is deficient.

[2]*See People v. Perez,* 9 Cal. 3d 651, 510 P.2d 1026, 108 Cal. Rptr. 474 (1973); *State v. Andrews,* 187 Kan. 458, 357 P.2d 739 (1960), *cert. denied,* 368 U.S. 868, 7 L. Ed. 2d 65, 82 S. Ct. 80 (1961); *United States v. Smith,* 5 C.M.A. 314, 17 C.M.R. 314 (1954); *McElroy v. State,* 146 Tenn. 442, 242 S.W. 883 (1922); *Harrison v. State,* 44 Tex. Crim. 164, 69 S.W. 500 (1902); *R. v. Windle,* [1952] 2 All E.R. 1; *cf. Schwartz v. The Queen,* 67 D.L.R.3d 716 (1976) (Supreme Court of Canada, in a

should be restricted to mean "morally" wrong.[3] Still other courts have combined the two concepts in some fashion.[4]

The conflict arises from the fact that *M'Naghten* itself is internally inconsistent on the meaning of the term "wrong," as several commentators have pointed out. *See* A. Goldstein, *The Insanity Defense,* at 51–53 (1967); H. Weihofen, *Mental Disorder as a Criminal Defense,* at 77 (1954); Cohen, *Criminal Responsibility and the Knowledge of Right and Wrong,* 14 U. Miami L. Rev. 30, 49–50 (1959). In response to the House of Lords' first question, the justices replied that if an accused knew he was acting contrary to law but acted under the insane delusion that he was redressing or revenging some supposed grievance or injury, or producing some supposed public benefit, then he would be punishable "if he knew at the time of committing such crime that he was acting contrary to law; by which expression we understand your Lordships to mean the law of the land." *M'Naghten's Case,* 8 Eng. Rep. 718, 722 (1843). The

---

5–to–4 opinion, held that one is legally insane if, because of mental disease, he did not know that by his act he was committing a crime). The problem with this approach, however, is that it makes ignorance of the law a defense. Under this test, those who knew that their actions were morally wrong according to the standards of reasonable persons could still be held legally insane if they did not know that they were violating the law.

[3]*See State v. Corley,* 108 Ariz. 240, 495 P.2d 470 (1972); *State v. Wetter,* 11 Idaho 433, 83 P. 341 (1905); *R. v. MacMillan,* [1966] N.Z.L.R. 616. The problem with this approach, however, is that it allows persons who actually know they are violating the law to escape punishment. Under this test, those who knew they were violating the law could still be held legally insane if they did not know that their actions were morally wrong according to the standards of reasonable persons.

[4]The New York rule is whether the accused knew his acts were legally *and* morally wrong. *See People v. Wood,* 12 N.Y.2d 69, 187 N.E.2d 116, 236 N.Y.S.2d 44 (1962); *People v. Irwin,* 166 Misc. 751, 4 N.Y.S.2d 548 (1938); *cf. People v. Schmidt,* 216 N.Y. 324, 110 N.E. 945 (1915) (Court of Appeals held that morally wrong is the "controlling test"). Courts in South Carolina and Utah, on the other hand, have held that the test is whether the accused knew his acts were either legally *or* morally wrong. *See State v. Thorne,* 239 S.C. 164, 121 S.E.2d 623 (1961), *cert. denied,* 368 U.S. 979, 7 L. Ed. 2d 440, 82 S. Ct. 485 (1962); *State v. Kirkham,* 7 Utah 2d 108, 319 P.2d 859 (1958).

record shows that the trial court relied upon this passage in approving the instruction at issue here. But in response to the House of Lords' second and third questions, regarding how a jury should be instructed on the insanity defense, the justices replied:

> If the question were to be put as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas the law is administered upon the principle that every one must be taken conclusively to know it, without proof that he does know it. *If the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable;* and the usual course therefore has been to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong: and this course we think is correct, accompanied with such observations and explanations as the circumstances of each particular case may require.

(Italics ours.) *M'Naghten's Case, supra* at 723.

Washington applies the *M'Naghten* insanity test very rigorously. *State v. McDonald,* 89 Wn.2d 256, 571 P.2d 930 (1977). Only those persons "'who have lost contact with reality so completely that they are beyond any of the influences of the criminal law" may benefit from the insanity defense. *State v. McDonald, supra* at 272, quoting from *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962). Our legislature's 1909 attempt to abolish the insanity defense has been held to indicate that established policy in this state is to strictly limit the application of the insanity defense. *State v. White, supra* at 590.

We believe that the proper interpretation of *M'Naghten* is that an individual is unable to tell right from wrong with reference to the particular act charged, if, at the time of commission of the offense, he is unable to tell that his act is one which he "ought not to do." *M'Naghten, supra* at 723. If the accused knew his act was wrong—either legally or

morally[5]—then he cannot be excused for his crime by the insanity defense. *State v. McDonald, supra.*

In most insanity cases, jury instructions need not distinguish between legal or moral wrong because the issue rarely arises. *M'Naghten* and our statutes clearly allow an open-ended instruction. Accordingly, the typical practice of submitting WPIC 20.01 to the jury without attempting to define "right" and "wrong" is appropriate.

Here, however, the issue arose because the defendant presented considerable evidence that because of his "Moscovite" belief, he believed his acts morally justifiable. This was the dilemma which caused the court to add the additional paragraph to the pattern instruction. While it would have been perhaps more thorough to have defined "wrong" in both its legal and moral sense, the court committed no error by restricting the definition of wrong to its legal sense. Assuming that the defendant could have proved he believed his act morally correct, he has failed to prove he did not know his act was illegal. The other half of the test not being met, no possible prejudice has resulted.

### SUFFICIENCY OF THE EVIDENCE

The defendant challenges the sufficiency of the evidence to sustain the verdict.

To establish an insanity defense, the defendant must show, by a preponderance of the evidence that:

(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:

(a) He was unable to perceive the nature and quality of the act with which he is charged; or

(b) He was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010(1)(a), (b).

---

[5]Morality here would reflect societal standards, not those of the particular individual. An accused's knowledge that an act is illegal will permit the inference of knowledge that the act is wrong according to generally accepted moral standards of the community. *State v. Corley,* 108 Ariz. 240, 495 P.2d 470, 472–73 (1972).

This court has reviewed the entire 1,122–page record with care, and we conclude that the defendant did not establish insanity by a preponderance of the evidence. A majority of the expert witnesses testified that in their opinions, the defendant understood the nature and quality of his act, and was able to distinguish right from wrong with reference to the act charged at the time of the offense. Although Rodney Crenshaw is exceedingly strange, he is in that category of persons who are mentally ill but do not meet the stringent requirements of the *M'Naghten* test. *See State v. McDonald, supra* at 272–73.

The defendant clearly perceived the nature and quality of the act with which he was charged. He killed his wife because a "Moscovite" kills his wife if she is unfaithful; he beheaded her to finish the job; and within days he was telling people what he had done, *i.e.,* killed his wife. The defendant also was able to tell right from wrong with reference to the particular act charged. The record is replete with actions the defendant took to conceal his crime. He deceived the farm employee in order to obtain the ax; he thoroughly cleaned the motel room to remove evidence of foul play; he hid the body in a remote area 25 miles from the scene of the crime; he ditched the bloodied car in a river 200 miles from the scene of the crime; he avoided the police; and when he was apprehended by police, he gave them a false name. Moreover, the defendant himself testified that he did such things because he "didn't want to get caught." Defendant's overwhelming concern over being caught for his act indicates to us that he very clearly knew that he had violated the law. As we held above, an accused's knowledge that his act is legally wrong is sufficient to render the accused criminally responsible for his act, assuming that other *M'Naghten* requirements are unsatisfied, as they are here. The defendant has failed to meet his burden of proof on the insanity issue.

The defendant's final assignment of error challenges the sufficiency of the evidence to sustain the verdict on the element of premeditation. Premeditation "must involve more

than a moment in point of time." RCW 9A.32.020(1). The record shows that much more than a moment in point of time was involved here. After the defendant had beaten his wife unconscious, he left the motel room to obtain a knife, and returned to kill her. There is clearly sufficient evidence in the record to sustain this element of the crime.

The judgment is affirmed.

ANDERSEN, J., concurs.

RINGOLD, J. (dissenting)—I respectfully dissent from the majority opinion insofar as it approves instruction No. 10 which limits the right and wrong test for the defense of insanity to "knowledge of a person at the time of committing an act that he was acting contrary to the law."

My understanding of the test as conceived by the majority is that a trier of fact may not acquit a defendant by reason of insanity if the defendant knows right from wrong either in a moral or in a legal sense. By so limiting the insanity defense I fear that it is reducing to an arid formality a substantive defense. Despite the heinousness of the crime committed, we as a civilized society will exculpate from legal responsibility one found to be insane. To whatever extent we err, as we most certainly will in so arcane an inquiry as into a defendant's sanity, we must err in the direction of maintaining insanity as a viable defense, for it is a much greater injustice to send an insane person to the penitentiary than to send a criminal to an asylum.

The new test promulgated by the majority brings to bear a defendant's knowledge of the law on his culpability. If we are going to adhere to the maxim "ignorantia legis neminem excusat," *State v. Boyett,* 32 N.C. 336, 343 (1849), how can we allow knowledge of the law to imply sanity and thereby be inculpatory? *Cf. Blumenthal v. United States,* 88 F.2d 522, 530 (8th Cir. 1937).

My view of the proper interpretation of *M'Naghten's Case,* 8 Eng. Rep. 718 (1843), was expressed by Justice Cardozo in *People v. Schmidt,* 216 N.Y. 324, 333–34, 110

N.E. 945, 947 (1915), when speaking for the New York Court of Appeals, he stated:

> The judges [in answering questions two and three in *M'Naghten's Case*] expressly held that a defendant who knew nothing of the law would none the less be responsible if he knew that the act was wrong, by which, therefore, they must have meant, if he knew that it was morally wrong. Whether he would also be responsible if he knew that it was against the law, but did not know it to be morally wrong, is a question that was not considered. In most cases, of course, knowledge that an act is illegal will justify the inference of knowledge that it is wrong. But none the less it is the knowledge of wrong, conceived of as moral wrong, that seems to have been established by that decision as the controlling test. That must certainly have been the test under the older law when the capacity to distinguish between right and wrong imported a capacity to distinguish between good and evil as abstract qualities. There is nothing to justify the belief that the words right and wrong, when they became limited by *M'Naghten's* case to the right and wrong of the particular act, cast off their meaning as terms of morals, and became terms of pure legality.

The New York court goes on to reconcile the apparent conflict between the first question of *M'Naghten's Case* and the second and third by pointing out that

> [t]he answer to the first question, though it seems to make the knowledge of the law a test, presupposes the offender's capacity to understand that violation of the law is wrong. . . . A delusion that some supposed grievance or injury will be redressed, or some public benefit attained, has no such effect in obscuring moral distinctions as a delusion that God himself has issued a command. The one delusion is consistent with knowledge that the act is a moral wrong, the other is not.

*People v. Schmidt,* 216 N.Y. at 335, 110 N.E. at 948.

Further, I believe our Supreme Court has adopted the moral rather than the legal definition. As pointed out by Professor Arval Morris, the Supreme Court expressly approved a jury instruction providing that the accused was legally insane if his mind was diseased to such an extent

that he was "*unable to perceive the moral qualities of the act with which he is charged* and was unable to tell right from wrong with reference to the particular act charged." (Italics mine.) *State v. Davis,* 6 Wn.2d 696, 708, 108 P.2d 641 (1940), quoted in Morris, *Criminal Insanity,* 43 Wash. L. Rev. 583, 603 (1968). The same language italicized above was subsequently approved in *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962); *State v. Tyler,* 77 Wn.2d 726, 466 P.2d 120 (1970); *State v. Reece,* 79 Wn.2d 453, 486 P.2d 1088 (1971); and *State v. Quinlivan,* 81 Wn.2d 124, 499 P.2d 1268 (1972). While the *Davis* instruction is no longer appropriate by virtue of the enactment of RCW 9A.12.010, I think that neither statutory nor case law changes vitiate the clear implication that the Supreme Court understands "right and wrong" in the insanity test to mean *moral* right and wrong.

The concept of right and wrong must be an objective standard of right and wrong. The Arizona Supreme Court upheld in *State v. Corley,* 108 Ariz. 240, 242–43, 495 P.2d 470, 472–73 (1972), the following instruction:

> "Knowledge that the act was wrong, as the phrase is used in these instructions, means knowledge that the act was wrong according to generally accepted moral standards of the community and not the defendant's own individual moral standards. Knowledge that an act is forbidden by law will permit the inference of knowledge that the act is wrong according to generally accepted moral standards of the community."

I am not troubled by the majority's suggestion that according to this formulation one who knew his acts were unlawful could still be found insane, and thereby exculpated. As pointed out above, if we are to be consistent in our application of the maxim that ignorance of the law excuses no man, then a person's knowledge of the law must be immaterial to culpability. The fact that the law is, for the most part, an expression of the collective morality justifies the permissive inference that a defendant knows an act is immoral from his knowledge that it is unlawful.

Whether such an inference is to be drawn, however, should be left to the jury. In limiting the definition of right and wrong to the legal sense the court imposed on the jury a mandatory inference that the defendant was not insane, thereby directing a verdict.

I would remand for new trial.[6]

Reconsideration denied October 29, 1980.

Review granted by Supreme Court February 13, 1981.

---

[6]I would frame the instruction in the words of WPIC 20.01 without further definition of right and wrong. The drafters of WPIC must have been aware of the issue discussed here and concluded that without further elucidation the jury would be in better position realistically to determine the question of a defendant's sanity.