[No. 17624-0-III. Division Three. September 24, 1998.]

THE STATE OF WASHINGTON, *Respondent*, v. DAVID
OROVILLE SWAIN, *Appellant*.

2

*Jeffrey C. Barker*, for appellant.

*Steven M. Clem, Prosecuting Attorney*, and *Eric C. Biggar, Deputy*, for respondent.

PER CURIAM — David Swain has moved for accelerated review of a superior court order filed on June 23, 1998, finding him incompetent to stand trial and committing him to Eastern State Hospital. We hold the order is not appealable as a matter of right and is not subject to discretionary review. We therefore dismiss Mr. Swain's notice of appeal.

Mr. Swain is charged with second degree malicious mischief, RCW 9A.48.080(1). The charge arises from damage on May 11, 1998, to a mobile home allegedly owned by Richard A. Swain, Mr. Swain's brother. The superior court ordered an examination pursuant to RCW 10.77.060(1) to determine Mr. Swain's sanity and competency. Mr. Swain was examined at Eastern State Hospital, after which the court held a hearing on June 23, 1998.

At the hearing, Dr. Vern Cressey, a psychiatrist at Eastern State Hospital, testified Mr. Swain suffers from a mood disorder due to trauma resulting from a childhood automobile accident. The disorder is exacerbated by an ongoing substance-abuse problem. Mr. Swain also suffers from various personality disorders, demonstrating antisocial, paranoid, and some passive-aggressive traits. Dr. Cressey gave this opinion about Mr. Swain's competency:

> We feel that due to this sort of hypomanic state—over-talkative, hyper-verbal state—that he can't really concentrate and focus on all the issues at hand, that he doesn't quite get all the charges against him, he can't understand these proceedings well enough to really assist himself and likewise that he can't really assist his attorney in a meaningful way. He can be disruptive, intrusive, get angry, and then he can be fine.

Mr. Swain disrupted the proceedings more than a dozen times. Most of his interruptions were rambling and nonsensical. This colloquy as he was called to testify is revealing:

> MR. BIGGAR [prosecutor]: I would call David Swain to the stand.

THE DEFENDANT: Your Honor, I know you are confused. Who isn't?

THE COURT: Well, that's true, Mr. Swain. But I understand, sir, you want to testify; is that right?

THE DEFENDANT: Yes. But if you did things like—Let me explain something to you.

MR. WEAVER [defense counsel]: David, why don't you go up to the witness stand.

THE DEFENDANT: I forgot. I forgot we was in a courtroom. It's a mess.

Mr. Swain's direct testimony was similarly rambling and unfocused. His direct examination by defense counsel began:

Q Okay.

A In 1967, I had a State Industrial claim in Bunker Hill Mining, and everybody walked off and left and I had to go in the locker room. I crawl on my hands and knees and my attorney was Carl Maxie [sic]. Mr. Maxie was a good attorney. And I seen Mr. Maxie three years ago on the discrimination broke out in Spokane. And the people that moved in next door was a security officer at Eastern State, drug dealers. And I reported that.

I had a lot of trouble. What caused the trouble at Badger Mountain here was my past. I got four brothers and my half brother.

And my assault charge in 1976 when I moved up here to Spokane, I had a job hooking on a jammer in Sandpoint, Idaho. And Bill Swain and my cousin Sean McCarr (phonetics) tore it up. And then he hit me in the back of the head and I scrapped him. And that cost me $3,400 restitution. And [h]e came up and seen my mother this year and he said, "I got even with all of them." He's been that way all of his life. I shouldn't have to live with that. And you wouldn't, either. I am supposed to do things the way you are supposed to. I used to get paid for that.

And on that assault charge—

Q David, I am going—

A And on that assault charge—

Q I am going to have some questions for you.

A I was one of these guys that never held a job for six months in my life. And my work history said different. They took 19 trades in two years of college.

And the trailer—

Q David—

A —let's explain just one thing: The trailer was given to me in May of 1997. It was gaven (sic) to me. And it was Richard's decision to move that trailer to 800 Badger Mountain. And my income is $500 a month. And the title was gaven (sic) to me and the key was given to me and I don't want nobody in my home.

Q Okay. So is that trailer your home?

A Yes, and the title was stolen. It's gone. My food is gone. My dishes are gone. Twice the trailer was stripped. And I called—What started the trouble was they started selling guns and I called Chelan and Douglas County and I wrote a letter to Dennis English. It was the gun dealers. Richard was selling guns. He tried to sell me a .38 and Larry Swain has got a .38. And Richard sold a .9 millimeter to that one Mexican that works with him. He's an illegal alien.

Mr. Swain was able to give this testimony about his understanding of the roles of the people in the courtroom:

Q Who am I?

A My attorney.

Q Okay. What's my job?

A To represent me.

Q Who is that man in the black robe?

A He's the judge.

Q What's his job?

A Pardon?

Q What's his job?

A Well, that's for you to decide. You can say better than I can. I never went to law school.

Q Okay. What do you think his job is?

A You are trying to confuse me.

Q No, I'm not trying to confuse you. I'm just asking you. What's his job?

A Well, to make a decision.

 Can you make the right one? That's not asking much.

Q Who is this?

A He's the prosecutor.

 And I left a note in your office.

Q What's his job?

A I'm not very well satisfied with the way you did things. That's why we are having trouble in here right now.

Q What's his job?

A They threatened Larry if Larry went to Badger Mountain.

Q No, David. My question is, What's his job?

A He's the prosecutor. His job is to prosecute me.

Q Okay. And do you know what a jury is?

A What?

Q Do you know what a jury is?

A Yes, I know what a jury is. I can get one if I want one. But I will tell you what the old man told me—

Q Do you want a jury?

A I will tell you what the captain said. Everybody has to get along.

Q Do you want a jury?

A Yes, let's go for it.

Q Okay. Do you want to go to trial?

A This time they are going to have one.

Q Okay. If the judge asked you if you are guilty or not guilty of malicious mischief, what's your answer?

A It's not against the law. That's my trailer. The title that stole it, that's fraud. Richard tried to talk me into stealing it, I sewer, the lid for the sewer. And then the lumber up there, they built the well out there, that's stolen. Everything—all that stuff up there is stolen. They tried to slip me out.

And that guy said, "I need a woman," and he went across the street to Grant Valley Road. And that guy across the street, I went over and talked to him, and his wife—he works at the State Patrol office. He was gone. That guy almost lost his life.

Dr. Cressey told the court Mr. Swain's rambling testimony was typical of his conversations. Mr. Swain seemed to do better while he was on mood-stabilizing medications, the psychiatrist testified, and more hospital treatment would help Mr. Swain to "get organized."

The court concluded Mr. Swain was not competent and ordered him committed to Eastern State Hospital for up to 90 days "or until such time as Mr. Swain becomes competent." Mr. Swain filed a notice of appeal of the order and moved for accelerated review.

■ Mr. Swain contends the order is appealable as a matter of right pursuant to RAP 2.2(a)(7), which provides for appeal of "[a] decision declaring an adult legally incompetent, or an order establishing a conservatorship or guardianship for an adult." In context, we believe this provision is intended to provide for review of guardianship decisions under RCW 11.88. But that statute generally has abandoned the use of the term "incompetent" in favor of the term "incapacitated." RCW 11.88.010(1); see Laws of 1990, ch. 122, § 2. In light of RAP 2.2(a)(7)'s unambiguous use of

the term "incompetent," we conclude a decision declaring a criminal defendant incompetent under RCW 10.77 is reviewable as a matter of right.

We still must decide, however, at what point a competency determination under RCW 10.77.090 becomes reviewable as of right. The statute provides for a stay of proceedings, upon a finding of incompetency, for an initial period of up to 90 days. RCW 10.77.090(1). This period may be extended for an additional 90-day period, during which a "prompt hearing" must be scheduled. RCW 10.77.090(2). The defendant, defense counsel, the prosecutor, or the judge may demand that the hearing be before a jury. *Id.* If a defendant is found to be incompetent, the charges must be dismissed and civil commitment proceedings may be initiated.[1] RCW 10.77.090(3).

In light of this statutory framework, we hold RAP 2.2(a)(7) does not apply to a court's initial finding of incompetency. Such an interpretation would render reviewable every interlocutory decision in the process. Instead, we conclude an appeal of right exists only for the superior court's final determination of incompetency, after which the charges must be dismissed. The superior court's order at issue here thus is not appealable as a matter of right.

■■ Mr. Swain alternatively contends the order is subject to discretionary review under RAP 2.3(b)(2), which provides for review "[i]f the superior court has committed probable error and the decision of the superior court substantially alters the status quo or substantially limits the freedom of a party to act." Certainly the superior court's order here limits Mr. Swain's ability to act by delaying his arraignment and trial. The remaining issue is whether the superior court committed "probable error."

A person is incompetent for purposes of RCW 10.77 if he

---

[1]The statute provides for an additional six-month period of commitment if the defendant is found to be "a substantial danger to other persons, or presents a substantial likelihood of committing felonious acts jeopardizing public safety or security, and . . . there is a substantial probability that the defendant will regain competency within a reasonable period of time." RCW 10.77.090(3).

or she "lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(6). On review of a superior court's competency decision, the primary test is whether the court manifestly abused its discretion. *State v. Hicks*, 41 Wn. App. 303, 306, 704 P.2d 1206 (1985) (citing *State v. Crenshaw*, 27 Wn. App. 326, 330, 617 P.2d 1041 (1980), *aff'd*, 98 Wn.2d 789, 659 P.2d 488 (1983)). The superior court's decision is entitled to deference because only the trial judge has had the opportunity to observe the person's behavior and demeanor. *Crenshaw*, 27 Wn. App. at 330.

We see nothing in the record to suggest the superior court abused its discretion here. Dr. Cressey testified Mr. Swain's illness prevented him from understanding the proceedings or assisting in his own defense. Mr. Swain's rambling and incoherent testimony made that point even more clearly.

 Nevertheless, Mr. Swain argues he was competent for three reasons. First, he contends his understanding of the courtroom personnel and their responsibilities renders him competent. He relies on *State v. Ortiz*, 104 Wn.2d 479, 482-83, 706 P.2d 1069 (1985), *cert. denied*, 476 U.S. 1144 (1986), in which the court upheld the trial court's finding of competency in part because the defendant "understands that there is a judge in the courtroom, that a prosecutor will try to convict him of a criminal charge, and that he has a lawyer who will try to help him." However, in *Ortiz* the court also was persuaded by an expert opinion that the defendant was competent. Here, to the contrary, the expert's opinion was that Mr. Swain was incompetent. The court did not commit probable error by giving more weight to Dr. Cressey's opinion than to Mr. Swain's limited ability to explain the process.

Second, Mr. Swain contends he understood his defense and was able to render the necessary assistance to his counsel. In another context, the Supreme Court has explored the "ability to assist" factor of incompetency, holding it is a "minimal requirement." *State v. Harris*, 114

Wn.2d 419, 429, 789 P.2d 60 (1990). Here, Mr. Swain at times appeared to articulate a defense and to have a minimal understanding of the courtroom and the participants' roles. However, at other times Mr. Swain was confused, as when he "forgot we was in a courtroom." In light of this statement, particularly in combination with Dr. Cressey's testimony, the superior court did not commit probable error in finding Mr. Swain was unable even to assist minimally in his own defense.

Third, Mr. Swain argues the superior court should have given greater weight to defense counsel's opinion as to his competency. He relies on *Crenshaw*, in which the court noted, "A lawyer's opinion as to his client's competency and ability to assist in his own defense is a factor which should be considered and to which the court must give considerable weight." *Crenshaw*, 27 Wn. App. at 331 (citing *State v. Israel*, 19 Wn. App. 773, 577 P.2d 631 (1978)). However, a lawyer's opinion alone cannot be determinative. In fact, in *Crenshaw*, the court expressly declined to be bound by defense counsel's reservations about the defendant's competency. *Crenshaw*, 27 Wn. App. at 331.

Mr. Swain has failed to demonstrate that the superior court committed probable error. The court's order thus is not subject to discretionary review. The matter was improvidently placed on the court's docket for decision on the merits. We decline to accept review and dismiss the notice of appeal.