IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,852






JOHN ALLEN RUBIO, Appellant



v.



THE STATE OF TEXAS






ON APPEAL FROM CAUSE NO. 2003-CR-457-A-1

FROM THE 138TH JUDICIAL DISTRICT COURT OF

CAMERON COUNTY




 Keller, P.J., filed a dissenting opinion in which Keasler, and Hervey, JJ.,
joined.



 I agree with the Court that error occurred in this case, but I do not agree with the Court's harm
analysis. If the jury could properly have found that Rubio was legally insane at the time he killed his
children, then this would be a more difficult case. But as it turns out, this is not a difficult case. Even under
Rubio's defensive theory, he was not legally insane.

 It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a
result of severe mental disease or defect, did not know that his conduct was wrong. (1) The pertinent question
in this case is what is meant by the requirement that a defendant know that his conduct is "wrong." It
appears to be undisputed that Rubio knew that killing his children was legally wrong. In Texas, such
knowledge is dispositive of the question of insanity: a person who knows that his conduct is illegal cannot
take refuge in the insanity defense. (2)

 We considered this issue, in a more common procedural context, in Bigby v. State. (3) Bigby was
charged with murdering his friend Mike Trekell and Trekell's sixteen-month-old son. Bigby's statement
to the police indicated that he had killed his friend under the (mistaken) belief that Trekell was conspiring
against him. After shooting Trekell, Bigby suffocated the child and placed him face-down in a sink filled
with water. Bigby said he did not know why he killed the child.

 At trial, several expert witnesses testified that Bigby knew that his conduct was illegal, but they
contended that he did not know the act was morally wrong. According to these experts, appellant believed
that regardless of society's views about this illegal act and his understanding that it was illegal, under his
"moral" code it was permissible. The jury found against Bigby on his insanity defense. In rejecting a claim
on appeal that the evidence was factually insufficient to support this finding, we said:

 This focus upon appellant's morality is misplaced. The question of insanity should focus
on whether a defendant understood the nature and quality of his action and whether it was
an act he ought to do.... By accepting and acknowledging his action was "illegal" by
societal standards, he understood that others believed his conduct was "wrong." (4)


Although the procedural posture in this case differs from that in Bigby, that case nevertheless stands for the
proposition that the viability of the affirmative defense of insanity is gauged by the actor's knowledge that
his conduct was illegal. (5) 

 This position is consistent with the origin of the M'Naghten rule, which is the basis of the insanity
defense in Texas. In 1843, Daniel M'Naghten tried to kill England's Prime Minister, Sir Robert Peel,
because M'Naghten believed, mistakenly, that Peel was conspiring against him. (6) In the attempt,
M'Naghten instead shot and killed Peel's secretary, Edward Drummond. (7) M'Naghten was acquitted by
reason of insanity, and a public uproar followed. (8) In response to this outcry, the House of Lords asked
a panel of judges a series of questions about the law of insanity. The first question asked of the judges was:

 What is the law respecting alleged crimes committed by persons afflicted with insane
delusion, in respect of one or more particular subjects or persons: as, for instance, where
at the time of the commission of the alleged crime, the accused knew he was acting
contrary to law, but did the act complained of with a view, under the influence of insane
delusion, of redressing or revenging some supposed grievance or injury, or of producing
some supposed public benefit? (9) 


Lord Chief Justice Tindal replied:


 [A]ssuming that your Lordship's inquiries are confined to those persons who labour under
such partial delusions only, and are not in other respects insane, we are of the opinion that,
notwithstanding the party accused did the act complained of with a view, under the
influence of insane delusion, of redressing or revenging some supposed grievance or injury,
or of producing some public benefit, he is nevertheless punishable according to the nature
of the crime committed, if he knew at the time of committing such crime that he was
acting contrary to law; by which expression we understand your Lordships to mean the
law of the land. (10)


This test excused from responsibility only those who had committed criminal acts while in extreme
delusional states that caused them to misperceive the very nature of their acts, or to believe that in acting,
they were obeying rather than violating the laws of society. (11) 

 Because M'Naghten intended to shoot to kill, despite his paranoid delusions, and never
claimed he thought the law sanctioned his act, he would not have been acquitted under
the test named after him. (12)


 Although Texas insanity law was initially derived from the M'Naghten test, (13) from 1974 to 1983
Texas used a different test, thought by some to be more appropriate. (14) But in 1983, public outrage over
the John Hinckley verdict led the Texas legislature to consider returning to the M'Naghten test. (15) 
Opponents of the revisions argued that persons who were clearly insane and should not be held responsible
for their actions would not meet the proposed "overly narrow" test. (16) As an example, they cited "the
woman who killed her child 'to exorcise a devil.'" (17) In spite of these concerns, Texas adopted a test that
"could hardly be narrower." (18)

 There has been some dispute in academic circles about the legal affect of Bigby's holding.
Discussing the Andrea Yates case, one commentator who was critical of the M'Naghten standard (19) 
contended that there was ambiguity in Texas about whether "wrong" should be considered from a legal or
a moral standpoint. (20) She argued that Bigby simply upheld "the jury's use of reasonable discretion in how
it would view the word 'wrong'" and did not bind "future courts with a definition of 'legal wrong.'" (21) But
any interpretation of Bigby that would allow for a different definition of "wrong" conflicts with the legislative
history of the 1983 amendment to the definition of insanity.

 Another commentator, who also criticized the use of the M'Naghten test, nevertheless described
the law in Texas thus:

 [A] mother whose religious delusions motivate her to drive out the devil by killing her
children clearly suffers from severely impacted thought processes. "How could knowledge
of right and wrong be more clearly displaced?" Unfortunately, for purposes of the
M'Naghten test, the fact that Andrea Yates realized the illegality of her act would be
enough to find her sane. (22)


 Justice Benjamin Cardozo, another critic of the M'Naghten test, gave the example of a devoted
mother who kills her child under the insane delusion that God ordered her to do so. (23) It seemed to Justice
Cardozo "a mockery" to say that she knows the act is wrong and thus has no insanity defense. (24) Yet this
is the law in Texas and in many other states. (25)

 Mental illness can indeed excuse criminal conduct, but only for a narrow range of offenders. Given
the evidence in this case, it seems clear to me that John Rubio is not within that range. I conclude that he
could not have carried his burden to establish that he was legally insane. That being so, the admission of
Maria Camacho's statements was harmless error. 

Filed: September 12, 2007

Publish 
1. Tex. Pen. Code § 8.01(a).
2. There is considerable evidence that paint-sniffing was the cause of whatever mental disorder
Rubio might have. I do not find it necessary in this case to consider whether mental disorder caused by
voluntary ingestion of dangerous substances is treated differently from mental disorder occasioned
through no fault of the actor.
3. Bigby v. State, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994).
4. Id. (citations omitted).
5. See id.
6. See M'Naghten's Case, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843). 
7. See id.
8. See id.
9. See id.
10. See id. (emphasis added).
11. Mentally Ill Criminal Offenders and the Strict Liability Effect: Is There Hope for a Just
Jurisprudence in an Era of Responsibility/Consequences Talk?, 57 Ark. L. Rev. 447, 480 (2004). 
This article carefully explains the issues raised by the subject of mentally ill offenders, but criticizes the
M'Naghten test and decries what it terms "the persistent influence of primitive religious notions of good
and evil" on the criminal law's treatment of mentally ill offenders. Id. at 509.
12. Id. at 467 (emphasis added).
13. Brian D. Shannon, Essay, The Time is Right to Revise the Texas Insanity Defense: An
Essay, 39 Tex. Tech L. Rev. 67, 71 (2006).
14. Id. at 72; Acts 1973, 63rd Leg., p. 883, ch. 399, §1, eff. Jan. 1, 1974 (enacting Tex. Pen.
Code § 8.01(a))(actor insane if he "either did not know that his conduct was wrong or was incapable
of conforming his conduct to the requirements of the law he allegedly violated").
15. Shannon at 73; House Study Group ("HSG"), SB 7, bill analysis, p. 22 ("supporters say")
(May 16, 1983).
16. HSG, p. 23-24 ("opponents say").
17. Id. at 24.
18. Deborah W. Denno, Who is Andrea Yates? A Short Story About Insanity, 10 Duke J.
Gender L. & Pol'y 1, 16 (2003) (quoting Elaine Cassel, The Andrea Yates Verdict and Sentence:
Did the Jury Do the Right Thing?, Findlaw's Writ, Mar. 18, 2002,
http://writ.news.findlaw.com/cassel/20020318.html).
19. Id. at 13-16.
20. Id. at 16-17. 
21. Id. at 16 n.139.
22. Abigail Wong, Filicide and Mothers Who Suffer from Postpartum Mental Disorders, 10
Mich. St. J. Med. & L. 571, 583 (2006) (citing Laura E. Reece, Comment, Mothers Who Kill:
Postpartum Disorders and Criminal Infanticide, 38 UCLA L. Rev.699, 704 (1991)).
23. See People v. Schmidt, 216 N.Y. 324, 339 (1915).
24. See id.
25. See, e.g., Bigby v. State, 892 S.W.2d 864 (Tex. Crim. App. 1994); State v. Hamann, 285
N.W.2d 180, 183 (Iowa 1979) ("There is no practical distinction between moral and legal right or wrong
in a murder case. Under any rational legal system ever devised murder would be prohibited. And under
any rational moral system ever imagined murder would be reprehensible."); 27 Wn. App. 326, 338-39
(Wash. 1980) ("If the accused knew his act was wrong-either legally or morally-then he cannot be
excused for his crime by the insanity defense."). But see, e.g., People v. Serravo, 823 P.2d 128, 135
(Colo. 1992).